Vertrees MOSES, by his father and next
friend, Wilton Moses, and all other
Negroes similarly situated

v.

**WASHINGTON PARISH SCHOOL
BOARD, a Corporation et al.**

Civ. A. No. 15973.

United States District Court
E. D. Louisiana,
New Orleans Division.

Oct. 19, 1967.

As Amended Oct. 26, 1967.

On Motion for New Trial

Nov. 15, 1967.

Richard B. Sobol, Donald Juneau, Nils R. Douglas, Collins, Douglas & Elie, New Orleans, La., for plaintiffs.

Welton O. Seal, Hillary Crain, Associate Counsel, Bogalusa, La., Woodrow Erwin, Dist. Atty., 22nd Judicial District, Franklinton, La., for defendants.

HEEBE, District Judge:

I.

Vertrees Moses, a minor, citizen and resident of Louisiana, a Negro, and student in the public school system of Washington Parish, instituted this class action by a complaint filed by and through his father, Wilton Moses, on September 28, 1965. The complaint alleged: that the individual plaintiff, as well as all other minor Negro students in the Washington Parish school system, were "irreparably injured" by "the continued operation by the defendants of compulsory biracial school systems" in Washington Parish; that "defendants maintain and operate compulsory biracial school systems by the use of dual school zones or attendance areas * * * [and] make initial assignments of students to the public schools under their control on the basis of race or color"; that "the Washington Parish School Board has not undertaken any steps to desegregate their school systems * * *." The plaintiff prayed for an order enjoining defendants and their associates "from continuing to operate compulsory biracial school systems in Washington Parish," from "continuing to maintain dual schemes or patterns of school zone lines or attendance area lines based on race or color," and for other supplemental relief. In the alternative, plaintiffs prayed "that this Court enter a decree directing defendant, the Washington Parish School Board, to present a complete plan * * * for the reorganization of the entire school systems under their respective jurisdictions into unitary, nonracial systems * * *; the drawing of school zones or attendance area lines on a nonracial basis * * *; and the elimination of any other discrimination in the planning or operation of the school systems or curricula under their respective jurisdictions which are based on race or color."

The matter came before Judge Frank B. Ellis, who formerly presided over this section of the Court. All issues were apparently discussed and resolved at a pre-trial conference held October 11, 1965, for with the consent of all counsel the formal hearing of the matter was continued indefinitely and Judge Ellis issued an order two days later which directed the desegregation of the Washington Parish school system and recited *in toto* a comprehensive plan for the implementation thereof.

Although there is nothing in the record to indicate the origin of the plan propounded by the Court in its order of October 13, 1965, it seems probable that the substance of that plan was taken by the Court from the plan desegregating the Bogalusa school system (an independent subdivision of the Washington Parish system), which had then just recently been ordered into effect by Judge Ellis in the case of Jenkins v. City of Bogalusa School Board, C.A. 15798, unreported.

■ Although the School Board and the individual defendants formally opposed the desegregation order, they undoubtedly acquiesced in the plan which implemented it, since the Board, as was its prerogative,[1] proposed no plan of its own.

The plan was set forth in nine numbered paragraphs, the first four of which provided for the rate of desegregation[2] of the Washington Parish school system, and for the right of students in the desegregated grades to transfer[3] out of the schools to which they had originally been assigned on the basis of their race; the plan did not, however, expressly abolish the original and racially segregated geographic zones. Nevertheless, paragraph five of the plan provided that:

"Beginning with the second semester of the 1965–1966 school year [the year in which grades 1 and 12 were to be desegregated], dual school districts on racial lines shall be abolished contemporaneously with the application of this plan to the respective

---

1. Cf. Singleton v. Jackson Municipal Separate School District, 348 F.2d 729 (5th Cir. 1965); Singleton v. Jackson Municipal Separate School District, 355 F.2d 865 (5th Cir. 1966); Calhoun v. Latimer, 321 F.2d 302 (5th Cir. 1963). These and other Fifth Circuit cases indicate clearly that the school boards retain the full right and authority to design and effectuate their own plans for the assignment of pupils and the administration of their school systems, consistent of course with the requirements of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). See Gibson v. Board of Public Instruction, Dade County, Florida, 272 F.2d 763 (5th Cir. 1959). The fact that there are so many decisions in which the courts themselves have formulated plans for school administration consistent with the Brown decision is simply the result of the fact that many of the school boards, like the Washington Parish School Board here, have refused, despite the clear command of *Brown* and the constant prodding of the district and appellate courts, to alter their traditional discriminatory pupil-assignment systems. As was done in this case, many of the boards have apparently been content, by their adamant refusal to properly administer their own school systems, to burden the courts with formulating plans and ordering them into effect.

2. Under Judge Ellis' original order and plan, desegregation was to begin in the second semester of the 1965–1966 school year with respect only to the first and twelfth grades in the Washington Parish

school system. Five more grades were to be desegregated in the following year, and under Paragraph 3(b) of the order, the last five grades within the school system of Washington Parish were to be fully desegregated as of the school year 1967–1968.

3. Under the original order the interim transfer procedure envisioned by Judge Ellis was not the "free-choice" system commonly in use in most of the other parishes of the state. Initial racially motivated assignments of pupils were not disturbed, nor was the School Board specifically ordered to abolish discriminatory assignment; nor did Judge Ellis or the School Board envision the granting of a "privilege" to all students within the system to elect or choose the school they wished to attend. Rather, the students in the *desegregated grades were to be* notified that they had a right to request transfer to a school other than that to which they were originally assigned. In addition, paragraph four of the order provided that pupils originally assigned to schools on the basis of their race, color or national origin should have the right to transfer to another school irrespective of whether or not the grades they were attending had been desegregated, in order to take courses not available in their school. The general intent of the order seems to have been to allow Negroes the right and the opportunity to overcome the effects of state discrimination rather than to provide for the free choice of schools by all students in the system.

grades when and as reached by the application of this plan.

"As the dual school system is abolished, the board shall present to the Court for approval its *maps and plans for a single system of geographic school districts*." (emphasis and material in brackets supplied)

On August 22, 1966, plaintiffs filed a motion to amend and supplement the original plan. The motion prayed for a set of additional provisions requiring the defendants to submit the maps and plans for an integrated geographically zoned school system already required by paragraph five of the original order but not yet furnished by the defendants. The plaintiffs' motion prayed in the alternative for a different set of provisions directed away from the geographical zoning procedure and installing updated provisions for the student-transfer system originally set up which would convert this part of the Court's original plan to a more recognizable and (for that time) legally adequate "free-choice" system. A pre-trial conference was held on September 8, 1966, at which time the defendants agreed to file with the Court and opposing counsel the maps required by the original order and plan. After additional conferences in December and January, and not having received from the Board any maps or proposed plans for single geographical zones, or any other proposal from the School Board, the Court issued an order on January 9, 1967, bolstering the transfer provisions of Judge Ellis' order to bring the original plan more into line with the minimum requirements of free-choice systems now established by the Fifth Circuit.[4]

Shortly thereafter there ensued a dispute between the parties regarding the School Board's compliance with the desegregation orders of this Court then in force culminating in the filing by plaintiffs of a motion for contempt pro-ceedings against the School Board and the defendant Oscar Slade, principal of the Varnado High School. The motion was withdrawn by plaintiffs insofar as it sought an order for criminal contempt against defendants, and the Court, after a four-day hearing on the plaintiffs' motion for an order of civil contempt, found that neither the Washington Parish School Board nor Mr. Slade had intentionally violated the orders of the Court, and dismissed the plaintiffs' motion on June 2, 1967.

Meanwhile, plaintiffs had filed a motion for further relief, seeking a complete revision of the orders and desegregation plan already in effect. This is the motion now before the Court for determination. Consideration of the motion was postponed by the intervening matters noted and for the additional reason that the Court wished to have the full benefit of the *en banc* opinion in the *Jefferson County* school case, which was expected but had not yet been rendered by the Fifth Circuit.

II.

Plaintiffs seek basically the following relief:

(1) Desegregation of all grades as of the present school year (1967–1968;

(2) Installment of a geographical zoned system for pupil assignment to replace the existing "transfer" or "free choice" system;

(3) "Secondary" provisions for full desegregation of the Washington Parish school system, including orders for faculty integration, transportation of students on a non-racial basis, desegregation of school services, facilities and activities, upgrading of inferior formerly all-Negro schools, and remedial education programs for students who previously attended all-Negro schools.

4. For the latest and quite strict requirements imposed by the Fifth Circuit on school boards adopting the so-called "free-choice" system, see United States v. Jefferson County Board of Education, 372 F.2d 836 (5th Cir. 1966), *en banc* opinion 380 F.2d 385 (1967).

■ With reference to the *rate* of grade-desegregation, what plaintiffs seek herein on the first count above was, and is, fully contained in the first order issued by Judge Ellis in this case; under paragraph 3(b) of that order, the final stage of desegregation was to be reached by the desegregation of the last five grades in each school in Washington Parish in 1967–1968. Moreover, the Fifth Circuit has made it quite clear in the Jefferson County case [United States v. Jefferson County Board of Education],[5] 372 F.2d 836 (5th Cir. 1966), rehearing *en banc*, 380 F.2d 385 (1967), that all grades in all public schools in this circuit must be desegregated for the 1967–1968 school year. The rate of desegregation is no longer an issue in the school cases in this circuit; the methods and the "plans"[6] proper to achieve the full desegregation now expected and required are the only matters still open to discussion.

■ The provisions which we have termed "secondary"—in the sense of being supplemental to the primary relief of full desegregation of student assignment sought by plaintiffs, and not by any means secondary in importance to the plaintiffs—are also fully required by the *Jefferson County* case.[7]

The crucial point of the motion is the plaintiffs' request that this Court amend its order by abolishing the "free-choice" system of pupil assignment and ordering the school board to set up in its place a system of geographic zones. We agree that the so-called "free-choice" system must be abolished, and we have affixed an order directing the school board to proceed with the task of drawing up a geographical single zoned system of pupil assignment; but we do so for reasons quite distinct from those suggested to us by the plaintiffs.

III.

Prior to the last school year (1966–1967), no Negro student had ever attended a "previously all-white school" in Washington Parish; no white child had attended a "previously all-Negro school"; this, despite Judge Ellis' order of October 13, 1965, ordering the desegregation of two grades in the system for the 1965–1966 year. In the 1966–1967 year, 18 Negro students attended previously all-white schools, according to the report of the Washington Parish School Board (Defendants' Exhibit 1). According to the counsel for plaintiffs, these students were allowed to transfer in the spring term of the 1966–1967

5. "Commencing with the 1967–68 school year, in accordance with this decree, all grades, including kindergarten grades, shall be desegregated and pupils assigned to schools in these grades without regard to race or color." 380 F.2d at 390.

6. Earlier decisions such as that in Calhoun v. Latimer, 321 F.2d 302 (5th Cir. 1963), have analyzed and passed on "plans" for the most part distinguishable only by varyin rates of grade-by-grade desegregation. In the *Calhoun* case, the so-called "Atlanta plan" was compared with the "New Orleans plan" and the "Houston plan" primarily in relation to the rate of desegregation provided in each plan. The court stated at one point:
"The unique Atlanta plan of desegregation from the top down operates in fits and starts when compared with what has become the almost universal plan of starting in the first grade and working up." 321 F.2d at 310.

Obviously, in the sense that the term was used in such cases as *Calhoun*, there is now only one "plan"—complete and full desegregation of all grades as of the 1967–1968 school year. Throughout this opinion the word "plan" has been used to connote a method or procedure of pupil assignment and does not refer at all to rate of desegregation.

7. The order accompanying this opinion incorporates the provisions of the plan promulgated by the Fifth Circuit in the *Jefferson County* case with respect to the provisions which we have termed secondary provisions and which are required apart from whatever method of pupil assignment may be employed in each particular case. Those provisions of the *Jefferson County* plan clearly correspond to the constitutional requirements of school desegregation as viewed by the Fifth Circuit, by whose views in this matter we are bound.

school year, only after this Court's supplemental order of January 9, 1967. Today is October 19, 1967. The Washington Parish school year 1967–1968 began formally on August 29, 1967. This year, according to the School Board's report, 16 of the original Negro transfer students "have expressed a desire" to remain at the same, "previously all-white," schools they attended in the second semester last year; 114 additional Negro students have applied for transfer to "previously all-white schools" for the present year. No white student is attending or has applied for transfer to a previously "all-Negro" school.

There are no figures in the record for the last two school years (1965–1966, 1966–1967); however, for the previous year (1964–1965), there were a total of 3,550 white students and 2,927 Negro students attending public schools in Washington Parish.[8] Figures introduced by stipulation of all the parties disclosed that in the 1964–1965 school year,

conditions in the all-white schools were slightly better, and somewhat more money was spent on white pupils than on Negro pupils.[9]

Plaintiffs argue that, under the *Jefferson County* decision, an affirmative duty to integrate the public schools is imposed on the Parish officials, that the free-choice system has not "worked" to achieve integration, and that a new tact must be tried to achieve what has not been achieved by the free-choice system.

The battles of the last 13 years which have raged over the "pace" of school desegregation in the South under Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), are over. There will be no more haggling about how many grades must be desegregated "next year." The present school year, 1967–1968, was set long ago as the final target date for the end of *"de jure* segregation" in the public schools.[10] The Court of Appeals for this circuit has

---

8. These figures are derived from the stipulation between counsel for the plaintiffs and counsel for the defendants, which stipulation incorporates, and according to all counsel accurately reflects, the figures contained in the 114, 115, 116 Annual Reports of the Louisiana State Department of Education. A breakdown of the two totals reveals that 2,478 white students and 2,201 Negro students attended elementary grades in Washington Parish and that 1,063 white students and 726 Negro students attended high school grades in the Washington Parish school system. There were 9 white students classified as "special ungraded elementary students."

9. The figures and the stipulation referred to in the preceding footnote reveal that white students in all-white schools in the 1964–1965 school year received somewhat better treatment than Negro students. There were fewer students per teacher in the white schools than in the Negro schools. *Per-pupil* expenditures for instructional personnel, instructional services, the education of crippled and exceptional children, equipment, books in school libraries and transportation expenses were invariably higher in the white schools than in the Negro schools. Of particular note is the fact that the values assigned by the State Department of Education to school buildings for white

students, subdivided on a *per-pupil* percentage basis, was more than three times higher than the per-pupil value of Negro school buildings. Finally, the cost of school equipment for white students was $133.76 per student while the cost of equipment furnished to Negro students was only $42.03 per student.

10. In April 1965 the Department of Health, Education and Welfare in its "General Statement of Policy Under Title VI of the Civil Rights Act of 1964 Respecting Desegregation of Elementary and Secondary Schools" (the first "Guidelines"), fixed the fall of 1967 as the target date for total desegregation of all grades. Cf. United States v. Jefferson County Board of Education, 372 F.2d 836, 851 (5th Cir. 1966). In early 1966 the Fifth Circuit indicated that it, too, considered the 1967–1968 school year as the "target date for the extension of desegregation to all grades of school systems not fully desegregated in 1965–66." Singleton v. Jackson Municipal Separate School District, 355 F.2d 865, 868 (5th Cir. 1966). In the very case now before this Court, Judge Ellis' original order required desegregation of all grades, under a nonracial geographical zoned pupil-assignment system, for the fall term of the 1967–1968 school year.

now declared that every grade in every public school in Louisiana and the other southern states is to be "officially" desegregated as of this school year. The battles over the pace of desegregation, gone forever, must now be seen as shuffling sectional skirmishes precedent to a nationwide controversy over the methods, purposes, and degree of integration of the races in the schools and, perhaps, in many other areas of national life as well. The importance of the present motion, and the significance of the philosophy behind it, cannot be overestimated.

■■ The legal issues center around the terms "de jure" and "de facto" segregation." Lest there be confusion from the beginning, it should be understood that as used conventionally now by most legal writers and courts, the term "de jure segregation" means simply "segregation" in the traditional sense, that is, forced, purposeful separation of the races; whereas "de facto segregation" cannot be said to mean "segregation" in the traditional sense at all, but rather the mere chance or fortuitous concentration of those of a particular race in a particular class or school—fortuitous "separation" of the races, not accomplished in any way by the action of state officials. The choice of the term "de facto segregation" to thus represent a situation not brought about by segregation at all is regrettable, but the term has insinuated itself into the dialogue and we must live with it.

Judge Wisdom stated in the first *Jefferson County* opinion, "racial imbalance caused by racially motivated conduct [that is, 'de jure segregation'] is clearly invalid. When racial imbalance results fortuitously, there is a split of authority." 372 F.2d at 874.

The *Brown* decision [11] stated:

"To separate [Negro children] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.

\* \* \* \* \* \*

" 'Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. \* \* \* Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of negro children \* \* \*.' [Citing lower court]

\* \* \* \* \* \*

"We conclude that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment." 347 U.S. 483, at 494, 495, 74 S.Ct. 686, at 691, 98 L.Ed. 873.

No one could dispute that these statements in *Brown* were directed solely at *de jure* segregation—segregation imposed by the state. Since 1954 however, as the theory and philosophy of school desegregation has advanced along with the hassle over when *de jure* segregation was actually to end, some authorities who see a need for affirmatively and actively integrating the races have attempted in all sincerity to use *Brown* to support their position; [12] and certainly statements in the opinion, taken out of the context of the time and the occasion for which they were written, and out of the context of

---

11. Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

12. See Hobson v. Hansen, 269 F.Supp. 401, 504 (D.C.D.C.1967), footnote 185 and accompany text; Dunn, Title VI, the Guidelines and School Desegregation in the South, 53 Va.L.R. 42, 67–68. The Dunn article employs what must surely be a classic example of *non sequitur*, for the author quotes the *Brown* decision to the effect that "[separation

the opinion as a whole, can be used to support the argument that *"de facto* segregation"—separation of the races by chance or by other circumstances beyond the control of the state and school officials—has been condemned as unconstitutional by the Supreme Court. While this Court does not categorically deny that there can be any constitutional basis for outlawing *"de facto* segregation," and we certainly do not wish to imply that, apart from federal constitutional requirements, there may be sound reasons for a policy of encouraging active integration in the public schools, we nevertheless reject attempts to find in *Brown* any support for these principles. The development of the thinking in this area had simply not developed to the point whereby the Court in 1954 could reach any sound conclusions at all about the legality of *de facto* segregation. Those who wish to rule *de facto* segregation unconstitutional must come to rea-

sonable, logical and proper legal conclusions of their own to support this position.

Plaintiffs argue that the recent *Jefferson County* case, both the first and the *en banc* opinions, requires a certain numerical percentage of integration in the schools under free-choice plans and that, since that percentage has not been reached under the free-choice system in effect in the Washington Parish schools, the free-choice plan there must be abandoned and a new method adopted which (presumably) will reach the percentage required. Although the plaintiffs have not argued here that *Jefferson County* ruled *"de facto* segregation" unconstitutional, that contention is certainly a possible one in support of plaintiffs' motion, and is closely related to the thrust of much of plaintiffs' argument herein.[12a] Although we disagree with that contention,[13] we avoid the issue since we grant

of Negro children] of similar age and qualifications *solely because of their race* generates a feeling of inferiority * * * " and concludes from this that "the question is not merely whether racial classification continues to be official policy, but in addition, whether school officials bear legal responsibility for operating a system segregated in fact." Ibid, pp. 68–69.

12a. We indicate *infra* our position that the requirement in *Jefferson County* that a certain percentage of integregation be achieved under free-choice plans should be interpreted as a requirement limited to free-choice plans solely. See n. 13. If in fact the plaintiffs would interpret *Jefferson County* as requiring the *Guidelines'* percentage of integration, not only under free-choice plans, but also under the alternative plan which they suggest, we could not avoid the conclusion that the chief issue in this case is one of *"de facto* segregation."

13. There is strong support for the conclusion that the Fifth Circuit in the Jefferson County case was far more concerned with *"de jure* segregation" and its eradication than it was with outlawing as unconstitutional *"de facto* segregation." In its *en banc* opinion the court (a majority of eight of the judges as opposed to four dissenters) affirmed and substantially adopted the desegregation decree pro-

posed by Judge Wisdom who wrote the opinion for the majority on the first hearing of the case. The *en banc* majority opinion itself is quite short. The most significant statements made by the court are contained in the following passages from paragraphs 3 and 4 of the opinion:

"The Court holds that boards and officials administering public schools in this circuit have the affirmative duty under the Fourteenth Amendment to bring about an integrated, unitary school system in which there are no Negro schools and no white schools— just schools. Expressions in our earlier opinions distinguishing between integration and desegregation must yield to this affirmative duty we now recognize. * * * The necessity of overcoming the effects of the dual school system in this circuit requires integration of faculties, facilities and activities as well as students.
* * * * *
"Freedom of choice is not a goal in itself. It is a means to an end. A school child has no inalienable right to choose his school. A freedom of choice plan is but one of the tools available to school officials *at this stage* of the process of converting the dual system of separate schools for Negroes and whites into a unitary system. The governmental objectives of this conversion

plaintiffs' motion on other grounds. Nevertheless, we feel constrained to comment on our fundamental disagreement with a position so intimately related to plaintiffs' interests in this case and one which will surely become of major sig-

is—educational opportunities on equal terms to all."

This Court does not interpret these expressions as indicating a wholesale adoption by the Fifth Circuit of the so-called "equal educational opportunity theory." Especially worthy of note is the fact that the court in a lengthy footnote distinguished between "*de facto* segregation" in the north and west and "school segregation" in the south. Although such a dichotomy has been criticized not only by the Court of Appeals of another circuit, Monroe v. Board of Commissioners, City of Jackson, 6th Cir. 1967, 380 F.2d 955, but also by a district judge in this district, Cf. Hall v. St. Helena Parish School Board, 268 F.Supp. 923 (E.D.La.1967); Davis v. East Baton Rouge Parish School Board, 269 F.Supp. 60 (E.D.La.1967), we think the distinction highly indicative of the Fifth Circuit's view of segregation under plans and policies prevalent in the South as a problem of *de jure* rather than *de facto* segregation. The Fifth Circuit in the *Jefferson County* footnote referred to above stated that

" * * * [s]chool segregation is 'inherently unequal' by any name and wherever located. But *de facto segregation* resulting from residential patterns in a non-racially motivated neighborhood school system has problems peculiar to such a system. The school system is already a unitary one. *The difficulties lie in finding state action and in determining how far school officials must go and how far they may go in correcting racial imbalance.* In such cases, Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) may turn out to be as important as *Brown.* A broad brush doctrinaire approach, therefore, that *Brown's* abolition of the dual school system solves all problems is conceptually and pragmatically inadequate for dealing with *de facto*-segregated neighborhood schools. We leave the problems of *de facto* segregation in a unitary system to solution in appropriate cases by the appropriate courts."

Equally significant is much of the language in Judge Wisdom's opinion in *Jefferson County* since that opinion was approved and adopted at the *en banc* rehearing of the case. Judge Wisdom, although quite adamant in refusing to distinguish between integration and so-called "desegregation," nevertheless strongly implied that "integration," as he used the term, was purely and simply necessary to abolish not *de facto* segregation but *de jure* segregation; particularly, we read Judge Wisdom's opinion and his emphatic denial of any legal distinction between the two terms as used in prior Fifth Circuit cases as a simple attempt to deprive school boards and school officials of a technical, legalistic distinction unnecessary in the law which had been used by school boards in the past to avoid their real and "affirmative" duty to simply abandon and abolish *de jure* segregation.

Thus, Judge Wisdom stated at one point "Less and less have courts accepted the question-begging distinction between 'desegregation' and 'integration' as a sanctuary for school boards fleeing from their constitutional duty to establish an integrated, *non-racial* school system." (emphasis supplied) 372 F.2d at 848.

Again, at p. 852, Judge Wisdom stated "In this circuit the school problem arises from state action. This Court has not had to deal with nonracially motivated *de facto* segregation, that is, racial imbalance resulting fortuitously in a school system based on a single neighborhood school serving all white and Negro children in a certain attendance area or neighborhood."

Again, Judge Wisdom stated "The [*Briggs* dictum, which distinguished between 'desegregation' and 'integration' and imposed on the states only a duty to 'desegregate'] would also be defensible, *if* the *Briggs* court had used the term 'integregation' to mean an absolute command at all costs that each and every Negro child attend a racially balanced school." (emphasis added) Ibid at p. 865.

At 372 F.2d 866 the opinion states: "Adequate redress therefore calls for much more than allowing a few Negro children to attend formerly white schools; it calls for liquidation of the states' system of *de jure* school segregation and the organized undoing of the effects of past segregation."

Finally, and most significantly, the Wisdom opinion contained the following passage:

"Under *Briggs'* blessing, school boards throughout this circuit first declined to take any affirmative action that might be considered a move toward integration. Later, they embraced the pupil-placement laws as likely to lead to no more than a little token desegregation.

nificance in the future conduct of this matter.

Both Judge Wisdom in his opinion in *Jefferson County* and Judge J. Skelly Wright in his recent and much publicized opinion in Hobson v. Hansen, 269 F.Supp. 401 (D.C.D.C.1967), quite strongly assert *as a constitutional guarantee* the right of Negro students to "equal educational opportunities." Certainly no responsible citizen can deny that all citizens should be given "equal educational opportunities," if what is meant by that term is the opportunity of each citizen to receive as good an education as other citizens receive from the state. But the term "equal educational opportunities" seems to be used as a *word of art,* an expression connoting more than is conveyed by the conventional sense of the words used, by some courts and legal writers.

█ The theory of their opinions is certainly grounded in the fundamental concept that, although the states need not and are not constitutionally bound to provide any formal education for their younger citizens, when a state does provide public education (or the opportunity for a public education), it must provide that on an equal basis to each and every student in the system. Of course, allowances must be made for the influence of many factors beyond the states' control, and inequalities will continue to exist from school to school and within each school in the best system and with the most well-intentioned of officials. With these principles, no one disagrees.

But the next premise of the argument is that the educational opportunities of Negro students are unequal, can never be equal, unless they are placed in classes with white students. Thus, if by the fortuitous circumstances of neighborhood patterns or of the free choices of individual children and parents, schools or classes result which do not grant to Negro children the "advantage" of education with white students, the Negro children must be receiving an education inferior to that of their white contemporaries and their fellow Negroes who are attending classes with white children.

█ Throughout a reading of the *Jefferson County* and *Hobson* cases, as well as other cases and comments by the proponents of the "equal educational opportunity" theory, we have questioned the basis of the theory. Why should a Negro child receive an inferior education *merely* because he may attend classes only with those of his own race? The exponents of the theory point to *Brown* and quote the phrase: "Separate educational facilities are inherently unequal."

Now they turn to freedom of choice plans supervised by the district courts. As the defendants construe and administer these plans, without the aid of HEW standards, there is little prospect of the plans ever undoing past discrimination or of coming close to the goal of equal educational opportunities. Moreover, freedom of choice, as now administered, necessarily promotes resegregation. The only relief approaching adequacy is the conversion of the still functioning dual system to a *unitary nonracial system*—lock, stock, and barrel.
"*If this process be 'integration' according to the 1955 Briggs court, so be it.*" (emphasis supplied) 372 F. 2d at 878.
With such language the Fifth Circuit, although upholding the free-choice system as "one of the tools available to school officials at this stage of the process of converting the dual system of separate schools for Negroes and whites into a unitary system", 380 F.2d 390, required that the HEW *Guidelines* percentages of integration be met under such plans. Certainly this action might be interpreted as the doing of what the Court itself elsewhere condemned as a "broad-brush doctrinaire" attack on *de facto* segregation; but the better interpretation, which this Court sees in the action, is a strong reaction by the Court to the *de jure* segregation inherent in free-choice plans themselves, see text *infra,* pages 847, 848. It is suggested that the percentages of integration required by *Jefferson County* would not have been required by the Court with such concreteness had the Court been confronted with nonracial single geographical zoning systems of pupil-assignment rather than so-called "free-choice" plans.

As we have said, we find no authority in the out-of-context reference to this isolated phrase in *Brown*. Blind reference to the quote only obscures the important factual question involved. This Court's considered position is that separation *which occurs fortuitously* is *not* "inherently" unequal.

The *Brown* case held simply that:

"To separate [Negro children] from others of similar age and qualifications *solely because of their race* generates a feeling of inferiority *as to their status in the community* that may affect their hearts and minds in a way unlikely ever to be undone." 347 U.S. at 494, 74 S.Ct. at 691 (emphasis added)

Certainly not this Court, nor any responsible person today, could argue with that statement, call it a legal principle or a social, psychological fact: a citizen of this nation, a child just beginning his formal training for a life in this society, must be hampered not only in his ability to learn .the techniques and talents to equip him for a useful and meaningful community life, but also in his willingness to use those talents for the best service to himself and his society, by the knowledge that his own government, the very society of which he should be an equal and esteemed member, has segregated him, thrust him and those of his class into separate schools. The prosperous, successful, intellectual, cultured and leadership faction of our national society is predominantly, almost totally, composed of those of the white race (which is by no means to say that all white persons are part of that faction, or that most Negroes do not possess an equal potential). What must the Negro, especially the Negro child, think to see himself purposefully separated by his own government from those he has a right to consider his fellow citizens? Segregation, for the Negro and in the context of our society, is sheer ostracism.. The white child of lower-class background or of low intelligence has not been so classified.

But what of Negro children who, because of their own choosing, because of the fortuitous arrangement of the population in their neighborhood, because of myriad other chance circumstances, find themselves in a classroom with no white students? Should this circumstance "generate a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone?" One has serious doubts that such would be the case. In any event, such a hypothet has yet to be tested and proved in any court of law within this Court's knowledge. Certainly a Negro child would have to be quite a sensitive individual to feel ostracized because of the fact that he and other Negroes live closer to a particular school than other children, especially where he can be assured that his state and state officials have done nothing to arrange or force that situation.

It is true that the Negro population is in fact ostracized from this society by the discriminatory housing policies of private homeowners, and by the prejudices of individual white citizens. But these are not problems of Negro school children alone; and they are not school problems, but housing problems; they are problems of individuals and their free relation with other individuals, requiring the exercise of individual understanding and the encouragement of government and the responsible portions of society in the erosion of prejudice.

This Court cannot see any factual basis for the finding, made by other courts on legal principles but without any inquiry into the fact at issue, that Negro children will be imbued with feelings of inferiority because of the chance situation of so-called *"de facto* segregation."

But even if that were the fact, this Court cannot sanction a rule of law which places the *legal burden* on the state to correct the effects on one class of individuals of chance occurrences or of the free exercise by another group of their rights of free association. Certainly governmental welfare programs, in the

right context and under the proper administration, are valid functions of the executive and legislative branches of government—but it is inconceivable that welfare (in general, or any welfare program in particular) should be made a constitutional requirement apart from an amendment to the Constitution.[14] We are especially concerned about the support of the "equal educational opportunity" theory by means of the formulation of a constitutional "right" of one class of individuals to association with other individuals. This Court would call attention to some of the fundamental concepts implied in our Declaration of Independence, the Bill of Rights and the Fourteenth Amendment.

Political rights in the traditional sense have generally (and correctly) been understood as protective barriers (self-imposed, or at least adamantly "recognized," by the people through the Declaration of Independence and the Federal Constitution) between each individual citizen of this nation and the external forces of government and mass society. A man with a "right" in this sense is entitled to say to his government and to the world: "Do not come within this particular sphere of my activity, for to do so would be to infringe on my *integrity*." But where a so-called "right" is said to entitle a person to bring (with the force of legal and constitutional guarantees) within his sphere of integrity one or more other individuals, entitles him to say that: "Unless you (a particular individual or group) come within this sphere around me, I will lose my own integrity (or my right to an 'equal' education)"—then surely that cannot be termed a "right" at all. Is the integrity of the individual, or of any number of individuals, really recognized when the appropriation of other individuals or groups is stipulated to be necessary to its existence?

It should be noted that the rather obvious objective of the proponents of the "equal educational opportunity" theory is the elimination of racial prejudice through the public school system, rather than the immediate fulfillment of equal educational opportunities for all students. Little has been put forth to prove that actual and active integration will in fact of itself raise the educational opportunities even of formerly segregated Negro students. The only concrete educational disadvantage seen in *de facto* segregation by some authorities is the lack of contacts for Negro students with the sons and daughters of the white middle-class culture; according to this approach, the states are apparently constitutionally bound to provide each student with a good glimpse in the classroom of "white middle-class culture." But in a school district where only Negro children live, the goal is simply not possible. Have the "rights" of the Negro students in a

14. Unfortunately, the role of requiring what are essentially corrective and welfare programs under the guise of constitutional rights has been forced on the courts by the other branches of government. The desegregation *Guidelines* promulgated by the Department of Health, Education and Welfare, which are admittedly designed to encourage active integration in state schools through the administration of federal financing programs, actually shift a large and unnecessary burden onto the judiciary by the provision in the *Guidelines* that any school board subject to a desegregation order issued by a federal court is eligible for the financial benefits administered by HEW. Obviously the effect of the provision is to strongly encourage the courts (which unfortunately must support their orders by constitutional and legal principles) to order a degree of "desegregation" or "integration" substantially equal to that required elsewhere in the *Guidelines*. The courts are put "in a bind," since to require less than the *Guidelines* would be to make it advantageous financially for school boards desiring to maintain segregation to be subject to suit and to desegregation orders from the courts. Thus, one finds the Fifth Circuit depending heavily on the *Guidelines*, and in fact adopting them as "rules of thumb" in determining whether the school boards subject to desegregation orders have complied with constitutional standards. See particularly Judge Wisdom's opinion in the *Jefferson County* case, 372 F.2d 836 (5th Cir. 1966).

school system been denied because there are not enough white students in the system to go around? The mere impossibility of defining such a "right" in terms applicable to individuals, or even classes of individuals, other than on a purely fortuitous and circumstantial basis, is itself a strong mitigating factor against attempting to postulate that right.

■ This is not to say that a particular *"de facto* segregated" school with an all-Negro student body, may not be actually unequal to other schools in a particular school system, or that the proper and just solution to inequality in the case of a particular school may not demand affirmative integration where other efforts to equalize the school cannot succeed. But the emphasis should always be on a good education for all students, and courts should refuse to rule that a particular all-Negro school, where the Negro concentration is fortuitous, is *ipso facto* unequal and that the solution to the "problem" is the forced mixing of the races.

We again stress our agreement (but again, in the proper context) with a policy in the field of education, on both state and federal levels, of encouraging the dissipation of prejudice between our citizens and the unification of our society. And government can surely take an active part in furthering such a policy. But to replace the tools of governmental policy with the unnatural "rights" imagined by some would, in the opinion of this Court, undermine our legal foundations of individual liberty and integrity so necessary today to offset the strong opposite tendencies of an emerging mass-society.

We would interpret the decisions which have coined the slogan of "equal educational opportunities" as the products of one or both of two tendencies: a dissatisfaction and disenchantment of courts with the hollow assurances of state and school officials that they will cease their continuing and very real attempts to maintain *de jure* segregation in the schools, after thirteen years of "deliberate speed" hedging; [15] and an attempt by civic- and social-minded judges to add legal precepts to the force of moral, social and political principles in the effort of the responsible sectors of our society to eradicate the divisive and ruinous prejudices between the citizens of this nation.[16] Both tendencies are laudable.

---

15. Clearly this was the case in the Fifth Circuit's *Jefferson County* decision; see footnote 13.

16. This was apparently a moving force behind Judge Wright's recent opinion in the Hobson v. Hansen case, supra. One sanguine commentator on the *Hobson* decision has pointed out with much insight that

"The main thrust of Judge Wright's decision * * * is to put forward more desegregation as the solution for the ghetto school problem in Washington." Alsop, No More Nonsense About Ghetto Education, "The New Republic, July 22, 1967, p. 18.

The same author points out the same tendency in the reports of the Civil Rights Commission, referring to it as

". . this strange view that ghetto children can never be rescued, can never be educated, unless they are subjected to the benign classroom influence of white middle-class children. Ghetto children have all the potential of any other children; but

in their background of poverty and deprivation, they have a heavy handicap. What is needed, therefore, is to overcome the handicap * * *. A good many of the liberal educators and sociologists have done everything possible to discredit and block the practical solution of the educational problem of our Negro minority, which is radical school improvement inside the ghetto. These people seem to have the attitude, in fact, that if they could not get desegregation, nothing else would do—and to hell with the millions of Negro children who have little hope of entering integrated schools!" Ibid, at p. 21.

Alsop's emphasis is that "school quality is a far more important factor than racial feeling in this white flight from desegregated schools that has made such a mockery of the good intentions of people like Judge Wright." The practical effect of unprepared and wholesale active integration, according to Alsop, simply has the result of a swift migration

But the end does not necessarily justify the means. *De jure* segregation can be eradicated without ordering a wholesale mixing of the races and making that order a principle of constitutional law. And prejudices can be eroded and this nation united without dispensing with the legal and constitutional philosophy which is our unique and precious inheritance.

*The best solution to the legal problems of school desegregation lies in recognizing that the real issue remains one of de jure segregation and that most situations of so-called "de facto segregation" are, in reality, the result of intentional discrimination by state officials.*[17]

### IV.

In the annexed decree, the Court has ordered the abandonment of the so-called "free-choice" method of pupil assignment for the Washington Parish school system and, in its place, the institution of a geographical zoning plan. As we have indicated, we by no means base our decision on the theory that

"free-choice" has not "worked" to integrate the school system and that a different method must therefore be tried. Nor do we abolish the system because we have found the choice of the students forced by the state or external influences and not in fact "free"; there was in fact no evidence whatever introduced at the hearing of this matter or at any point in the proceedings to indicate that either Negro or white students have not been totally and absolutely free to choose any public school in Washington Parish or that any student has been denied any choice he has made. Nevertheless, our decision is well grounded on the facts available in the record and the presumptions and reasonable inferences available in the circumstances of this case.

So-called "free-choice systems" are quite popular in Southern school districts today. According to a July 1967 report of the U. S. Civil Rights Commission, free-choice plans "are favored overwhelmingly by the 1,787 school districts desegregating under voluntary plans. All such districts in Alabama, Missis-

---

of white couples with school-age children to the suburbs, and that in fact "the practical result of unprepared desegregation is an enlarged ghetto with a greater number of segregated schools than there were in the first instance." Ibid, at p. 19.

17. Insofar as it addresses this point, see Judge Wright's article at 40 N.Y.U.L.R. 285, 295 (April 1965). Judge Wright states that

"In most cases, where a forthright effort is made by the courts to determine the cause of racial imbalance, it will be unnecessary to reach the question as to what a state may do, or must do, to relieve purely adventitious segregation." Ibid.

The ironic fact is that most state-segregated schools with all-Negro student bodies, are not only "inherently unequal" but in fact are actually and actively treated on a second-class basis by the school boards and school officials. In the present case, despite the protestations of the defendants that there has been no discrimination against the Negro plaintiffs, the facts revealed in the record are clear that the all-Negro schools in the

1964–1965 school year received less money, fewer teachers, older buildings, less and cheaper equipment, and on the whole quite inferior treatment in every respect than that accorded to the all-white schools in Washington Parish. Obviously, even the adventitious or fortuitous concentration of Negro pupils in particular schools will, in Washington Parish, help make those schools unequal if the school officials maintain their policy of in fact downgrading schools in which such fortuitous concentration occurs. In such cases it may be that the only possible method of eradicating actual *de jure* segregation by the school officials will be to force the integration of the students in such a way that the officials themselves will be prevented from favoring white students over Negro students. Certainly the implications of such an approach are present in Judge Wisdom's opinion in the *Jefferson County* case. Although such an approach might be permissible under this Court's constitutional philosophy, we would accept it only as a last resort, especially in the case of a school system impartially zoned on a geographical and nondiscriminatory basis.

sippi, and South Carolina, without exception, and 83 per cent of such districts in Georgia have adopted free-choice plans." It is this Court's personal understanding that all of the school districts in Louisiana except that of Orleans Parish operate under free-choice systems. It is clear, as the Civil Rights Commission states, that "free choice predominates in the areas of greatest resistance to desegregation."

Free-choice systems, as every Southern school official knows, greatly complicate the task of pupil assignment in the system and add a tremendous workload to the already overburdened school officials. There are no complaints however.

Pupil assignment in Washington Parish and the other parishes in Louisiana was not always such an arduous task, nor so complex. One need not go back more than three or four years in time to find the school systems in the South operating, along with those in the rest of the nation, smoothly and efficiently. In the days before the impact of the *Brown* decision began to be felt, pupils were assigned to the school (corresponding, of course, to the color of the pupils' skin) nearest their homes; once the school zones and maps had been drawn up, nothing remained to be done but to inform the community of the structure of the zone boundaries. Upon the rendition of the *Brown* decision and the issuance of the ultimatum to abolish the segregated dual zones in each school district, it was natural for the citizenry to expect to see the old coterminous dual zones abolished, and single independent zones drawn up around each school in each district. Ob-

viously, that was not the case. The first step was taken after thirteen years, but the second was not. How did the novel and complicated system of "free-choice" assignment originate, and how did it come to be the prevailing and nearly the sole method by which students are now assigned to schools in districts throughout Louisiana and the South? More particularly, how did the system arrive in Washington Parish?

The latter query is easily answered: the school board proposed no plan for the administration of a desegregated school system and in all probability all concerned informally deferred to the Court the drawing of a plan, presumably to conform to the Bogalusa plan which Judge Ellis had ordered into effect the month before.[18] From whence did the Bogalusa plan issue? Probably, like most of the court-ordered desegregation plans, from one source: the mind of the judge hearing the case.

It is indisputable that the school officials of each state and district have the complete authority, indeed a full measure of responsibility, to design, initiate, and effectuate the administration of the school systems under their care, including plans for the assignment of pupils to the various schools in their particular districts, with the only caveat that all citizens be treated equally and fairly. In any case involving desegregation of school systems and the unconstitutionality of existing school board plans and policies, the school officials have every right and the duty to come forward with nondiscriminatory plans for pupil assignment drawn by themselves;[19]

---

18. See footnote 1, supra.

19. The duty is so obvious that it hardly needs to be supported by legal authority. However, we would call attention to a passage in the case of Calhoun v. Latimer, 321 F.2d 302 (5th Cir. 1963), wherein the Court of Appeals stated:
"We do wish, however, to point out some fundamentals to be borne in mind in the future handling of this and like matters where an approved plan is in operation. Whether to effect a plan, to speed it up, or to otherwise modify

it is in the first instance for the school board. This is likewise true as to problems arising in connection with the administration of a plan. The courts are ill equipped to run the schools. Litigants must not ignore school officials, and school officials must not abdicate their function to the courts. They, like the courts, are bound by the Constitution as interpreted by the Supreme Court. Cooper v. Aaron, supra [358 U.S. 1, 78 S.Ct. 1401, 3 L. Ed.2d 5]. With these principles in mind this record discloses no prob-

those officials are the persons with the administrative experience, and the knowledge of their particular districts and the particular considerations present in their districts which must be taken into account in any pupil-assignment plan.

 In most cases, the school boards have not done their duty—the duty they owe not only to Negro children, but to the white population and their electorate as a whole. They have escaped the inescapable burden of establishing nondiscriminatory systems by inaction which, although insufficient to provoke the courts to resort to punitive measures, has been significant enough to press those courts into the assumption of the burden themselves. The boards have let the courts, usually the federal district courts, bear their responsibilities for them. But this federal court, as well as every court, and every school board and every citizen, is bound by the law of the land. Prejudices and personal opinions, especially in the case of those who represent the people, are no excuse for avoiding legal responsibilities.

Upon investigation, it will be seen that the "free-choice" system, now deemed such an ordinary pupil-assignment device in the South and in Louisiana, evolved from four interrelated conditions: (1) the irresponsibility of local school officials and the consequent involvement of the courts in the creation and administration of the pupil-assignment systems, (2) the tendency of the courts in that situation to resort to the relatively simple procedure of ordering free choice of school by all pupils, (3) the very necessity of such free-choice procedures *as an interim measure* prior to full scale desegregation of all grades in each district, and (4) the realization by some school officials that what was intended by the courts as a quick and simple temporary solution to interim desegregation problems would in fact (a) aid long-range

de jure segregation by allowing a good measure of flexibility for the boards and officials to exercise a larger influence in furthering segregation and (b) shift the school boards' burden from their original mark, the courts, to a new scapegoat—the students themselves.

Judge Skelly Wright's order in the *Bush* case, in this very district, serves as a typical example of these processes. There, Judge Wright entered the Court's own nonracial pupil-assignment plan. The Court of Appeals, Wisdom, J., noted the contents of the order and the circumstances calling it forth:

"Six years ago, on February 15, 1956, the district court entered a preliminary injunction ordering the School Board to desegregate the New Orleans schools 'with all deliberate speed'. Up to that time the Board's opposition to desegregation had been dictated for the most part by longstanding customs and laws long on the statute books. * * * Finally, when it was apparent that the Board could not take independent action, the district court, July 15, 1959, ordered a desegregation plan filed March 1, 1960. Later, the court extended the deadline to May 16, 1960. [On May 16, 1960], having received no plan from the Board, the district court ordered the New Orleans schools desegregated under its own plan of desegregating a year at a time according to a step-ladder program, beginning September 1960. The order reads:

"IT IS ORDERED that beginning with the opening of schools in September 1960, all public schools in the City of New Orleans shall be desegregated in accordance with the following plan:

"A. All children entering the first grade may attend either the formerly all white public school nearest their homes, or the formerly all negro

lem that could not be resolved between appellants and the school officials, based on the judgment of the school officials as educators, with the ap-

plication of wisdom, forbearance, and mutual trust to the educational purpose of schools." 321 F.2d at 311.

public school nearest their homes, at their option.

"B. Children may be transferred from one school to another, provided such transfers are not based on considerations of race." 308 F.2d at 493.

The plan entered by Judge Wright in *Bush* was of the utmost simplicity, a limited form of the now common "free-choice" system; it was later approved by the Fifth Circuit and specifically termed an "option-transfer plan." Stell v. Savannah-Chatham County Board of Education, 333 F.2d 55, 65 (5th Cir. 1964). Not only was the order a simple one, it was quite necessary in the context of the "step-ladder" desegregation of the school systems then sanctioned by the courts. In the process of grade-by-grade desegregation, it is not difficult to imagine the hardships inherent and indeed the practical impossibility of requiring shifting geographical zones for desegregated grades, while allowing maintenance of the segregated assignments for grades not yet reached by the desegregation process. Undoubtedly under such a plan zones would have to be radically altered each year to accommodate newly desegregated grades. The hardships imposed, not only on the school officials, but on the students themselves would surely have been great.

"Free-choice" and "option" plans, although burdensome to school officials, were properly seen as an alternative vastly simpler than the immediate shift to geographic zoning of desegregated grades, an alternative to be applied during the process of desegregation and prior to full desegregation of all grades in a school system. The usefulness of free choice as an interim procedure had indeed been recognized by the Supreme Court, which required it on a purely individual request basis in grades not yet reached by the desegregation process. Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965).

But the usefulness of such plans logically ended with the end of the desegregation process. With all grades desegregated, there is no apparent reason for the continued use of the purely interim and temporary free-choice systems. Moreover, when attempted on a permanent basis, and the many serious inequities adjusted as has now been done by the *Jefferson County* decree, the system becomes so unworkable as to be ridiculous. Our predecessor, Judge Ellis, recognized this in the original order in this very case. In paragraph five of a plan which in fact provided for interim free choice of schools by the pupils themselves, Judge Ellis specifically ordered that:

"As the dual school system is abolished, the board shall present to the Court for approval its maps and plans for a single system of geographic school districts."

With the abolition of segregation in each and every grade in all Louisiana school systems, why do many districts, including this Washington Parish district, continue to assign pupils to schools by granting each student his choice of school? Perhaps the existence of this absurd situation is as much the fault of the courts as the school boards. Most courts, not having any idea of the real problems involved in running a school system, seem to have forgotten the real reason for the temporary utilization of transfer and choice procedures in the past and have come to regard such plans as a natural procedure in the process of school administration; the courts, usually without any prodding from the school boards, have simply enlarged and extended their interim plans to fill the need for permanent systems. Much of this attitude seems to have rubbed off on the boards themselves. Having been told to expand their first feeble steps at interim transfer plans into the now complex (but more just) permanent "free-choice" system with all its ramifications, the boards perhaps have come to look on that system as the only possible pupil-assignment system consistent with the desegregation of the schools; in any event, for whatever reasons, it is this Court's ex-

perience that the possibility of returning to the reasonable and normal geographical zoning system seems to be the furthest thing from the minds of most school officials.

It should be noted that Judge Ellis' original plan, entered in this case on October 13, 1965, as supplemented by this Court's order of January 9, 1967, is still in effect. To this very date, neither the school board nor any of the individual defendants have, as ordered by the Court, fulfilled their responsibility of submitting a plan for the proper and efficient assignment of pupils to schools within the system. We therefore have no hesitancy in reasserting the simple and express terms of Judge Ellis' order: that is, the fulfillment of a geographical zoning plan for pupil assignment in Washington Parish; that is the only reasonable basis for the administration of this, and the vast majority of all school systems; this Court will not perpetuate solely by the force of its own order rendered with the permission and the deference of the school board which has refused to submit a plan of its own, the continuation of the interim and now wasteful and unreasonable so-called "free-choice" system.

Realistically, we recognize the fact that the school board might well have intended to "adopt" the court's interim system as its own, on a permanent basis. However, if that is what the board intended, it should have submitted a plan to that effect long before this. As we have indicated, the very order originally entered and still in effect in this case contemplates a geographic zoning system as the permanent method of pupil-assignment in the Washington Parish school system. Certainly the defendants have given us no indication that they wish to remove the plan-making burden from this Court by the submission of a plan of their own, nor have they offered any reason why this Court should change the plan originally ordered by Judge Ellis herein.

Moreover, and certainly equally pertinent here, we would question the motives of the school board in suggesting any plan of pupil assignment other than one based on geographical zones. If this Court must pick a method of assigning students to schools within a particular school district, barring very unusual circumstances, we could imagine no method more inappropriate, more unreasonable, more needlessly wasteful in every respect, than the so-called "free-choice" system.

Under such a system the school board cannot know in advance how many students will choose any school in the system—it cannot even begin to estimate the number. The first principle of pupil assignment in the scheme of school administration is thus thwarted; the principle ought to be to utilize all available classrooms and schools to accommodate the most favorable number of students; instead, this aim is surrendered in order to introduce an element of "liberty" (never before part of efficient school administration) on the part of the students in the choice of their own school. Obviously there is no constitutional "right" for any student to attend the public school of his own choosing. But the extension of the *privilege* of choosing one's school, far from being a "right" of the students, is not even consistent with sound school administration. Rather, the creation of such a choice only has the result of demoralizing the school system itself, and actually depriving every student of a good education.

Under a "free-choice" system, the school board cannot know or estimate the number of students who will want to attend any school, or the identity of those who will eventually get their choice. Consequently, the board cannot make plans for the transportation of students to schools, plan curricula, or even plan such things as lunch allotments and schedules; moreover, since in no case except by purest coincidence will an appropriate distribution of students result, and each school will have either more or less than the number it is designed to efficiently handle, many students at the end of the free-choice period have to be

reassigned to schools other than those of their choice—this time on a strict geographical-proximity basis, see the *Jefferson County* decree, thus burdening the board, in the middle of what should be a period of firming up the system and making final adjustments, with the awesome task of determining which students will have to be transferred and which schools will receive them. Until that final task is completed, neither the board nor any of the students can be sure of which school they will be attending; and many students will in the end be denied the very "free choice" the system is supposed to provide them.

Why is the Washington Parish School Board willing to undergo the uncertainty and the unreasonable burdens imposed by such a system? In order to secure for each child the privilege of attending the school of his choice? Inevitably not. Nine out of ten schools in a district cannot be abandoned merely because all the students want to attend the tenth school; many students must have their choice denied. Ironically, under the free-choice system, it is the white students who are causing most headaches for the school officials. In another case before this Court, one school official complained that "we only turned down but 34 colored children" under the free-choice system in his parish. He was complaining because of the fact that choices by 380 white children had to be denied by the board, and the board was then engaged in determining which 380 of the nearly 1000 students choosing a particular school would have to be reassigned. The statement serves to indicate that the officials are not so much impressed with the merit of giving each child his choice of school, but rather concerned with satisfying the number of Negro children who may apply for entrance into a white school, and shifting to both white and Negro students the boards' own burden to run honestly and actually desegregated truly non-racial systems.

We do not in any way imply that the free choice of schools by individual students is "undemocratic" or unfair to other students, but merely that such choices are simply not pertinent to the administration of a school system. We certainly would not rule out "free-choice" because the free choices of students may not have achieved a predetermined percentage of mixture of the races.

But where the implementation of the absurd system of free choice on a permanent basis has followed closely on the heels of the imperative to desegregate, we think there is some burden placed on a school board which adopts the system to advance some explanation as to why it was adopted and how it accomplishes the basic aims of good school administration. No such explanation has been forthcoming in this case; surely none can be. We have ordered the Washington Parish School Board to submit the maps and plans for a single non-racial geographic zoned system required under the original order in this case; and the full implementation of that system, as well as the "secondary" procedures required, beginning with the spring semester of this 1967–1968 school year.

## ORDER

It is ordered, adjudged and decreed that the defendants, their agents, officers, employees, servants and their respective successors, and all those in active concert and participation with them, or any of them, be, and they are permanently enjoined from discriminating on the basis of race or color in the operation of the Washington Parish school system.

### I.

### SPEED OF DESEGREGATION

Commencing with the spring term of the 1967–1968 school year, in accordance with this decree, all grades, including kindergarten grades, of the Washington Parish school system, shall be desegregated, and pupils assigned to schools in these grades, without regard to race or color.

## II.

### PUPIL ASSIGNMENT

A. *Geographic Zoning Plan.* For all grades within the Washington Parish school system, assignment of pupils to schools shall be made upon the basis of school attendance areas, which in turn shall be based upon a plan of geographic zoning of school districts. These zones shall permit, as far as possible, attendance nearest to each pupil's home.

B. *Preparation of Plan and Map Delineating the Particular Districts Thereof.* The Washington Parish School Board and each of the individual defendants, insofar as the authority of their positions within the Washington Parish school system warrants, including the agents, officers, employees, servants, and the respective successors of said defendants, and all persons to whom this order is directed insofar as the authority of their positions warrants, are hereby ordered to prepare and submit to this Court on or before November 15, 1967, a map of the Washington Parish school system, which map shall have delineated thereon the location of each public school within the parish and the lines dividing the geographical zoned districts required by Part II–A of this order. In addition to a map, the school board and the individual defendants shall prepare and submit to this Court any supplemental matter pertaining to the geographic zoned school system established by the map. The map and the plans for a single geographical zoned school system submitted pursuant to the orders of this Court shall be prepared by the defendants without regard to the race or color of the pupils concerned, and the Washington Parish School Board and the said defendants are hereby enjoined from discriminating, in the preparation of their map and plans for the pupil-assignment system described herein, on the basis of the race or color of the students involved.

C. *Exceptions to Assignments.*

1. Any student shall have the right, at the beginning of a new term, to transfer to any school from which he was excluded or would otherwise be excluded on account of his race or color.

2. Any student who requires a course of study not offered at the school to which he has been assigned, may be permitted, upon making written application, at the beginning of any school term or semester, to transfer to another school which offers courses for his special needs.

3. If the defendants operate and maintain special classes or schools for physically handicapped, mentally retarded, or gifted children, the defendants may assign children to such schools or classes on a basis related to the function of the special class or school that is other than that of geographic zoning assignment. In no event shall such assignments be made on the basis of race or color or any basis which tends to perpetuate a dual school system based on race or color.

4. If the geographic zones, as set forth in defendant's map and plans as these shall be finally approved by this Court, cause overcrowding or other temporary dislocations in a particular school, the Board may reassign students in a contiguous area to a school outside their prescribed attendance zone. In making such transfer the Board must reassign students in a nondiscriminatory fashion with the students living closest to the transferee school being transferred.

5. The Washington Parish School Board may, if it elects to do so, adopt the following additional procedure:

After all pupils have been enrolled in their attendance zones and there continues to be space available in their next nearest school, the School Board may receive and consider applications for reassignments to any such school, provided, however, that the school to which a student seeks reassignment is not overcrowded. In such cases reassignment shall then be made with preference to be given on the basis of the applicant's proximity to the school to which he seeks reassignment.

## III.

## SECONDARY PROVISIONS FOR THE DESEGREGATION OF THE WASHINGTON PARISH SCHOOL SYSTEM

A. *Services, Facilities, Activities and Programs.*

1. *In General.* No student shall be segregated or discriminated against on account of race or color in any service, facility, activity or program (including transportation, athletics, or other extracurricular activity) that may be conducted or sponsored by the school in which he is enrolled. A student attending school for the first time on a desegregated basis may not be subject to any disqualification or waiting period for participation in activities and programs, including athletics, which might otherwise apply because he is a transfer or newly assigned student, except that such transferees shall be subject to longstanding nonracially based rules of city, county or state athletic associations dealing with the eligibility of transfer students for athletic contests. All school use or school-sponsored use of athletic fields, meeting rooms and all other school-related services, facilities, activities and programs, such as commencement exercises and parent-teacher meetings which are open to persons other than enrolled students, shall be open to all persons without regard to race or color. All special educational programs conducted by the defendant shall be conducted without regard to race or color.

2. *Transportation.* School buses will be routed to the greatest extent, which is reasonable in light of the geographic distribution of students, so as to serve without regard to race each student in the system who is eligible for bus transportation on a uniform, nonracial standard.

B. *Faculty and Staff.*

1. *Faculty Employment.* Race or color shall not be a factor in the hiring, assignment, reassignment, promotion, demotion, or dismissal of teachers and other professional staff members, including student teachers, except that race may

be taken into account for the purpose of counteracting or correcting the effect of the segregated assignment of faculty and staff in the dual system. Teachers, principals, and staff members shall be assigned to schools so that the faculty and staff are not composed exclusively of members of one race. Wherever possible, teachers shall be assigned so that more than one teacher of the minority race (white or Negro) shall be on a desegregated faculty. Defendants shall take positive and affirmative steps to accomplish the desegregation of their school faculties and to achieve substantial desegregation of faculties in as many of the schools as possible for the 1968–1969 school year notwithstanding that teacher contracts for the 1968–1969 or 1969–1970 school years may have already been signed and approved. The tenure of teachers in the system shall not be used as an excuse for failure to comply with this provision. The defendants shall establish as an objective that the pattern of teacher assignment to any particular school not be identifiable as tailored for a heavy concentration of either Negro or white pupils in the school.

2. *Dismissals.* Teachers and other professional staff members may not be discriminatorily assigned, dismissed, demoted, or passed over for retention, promotion, or rehiring, on the ground of race or color. In any instance where one or more teachers or other professional staff members are to be displaced as a result of desegregation, no staff vacancy in the school system shall be filled through recruitment from outside the system unless no such displaced staff member is qualified to fill the vacancy. If, as a result of desegregation, there is to be a reduction in the total professional staff of the school system, the qualifications of all staff members in the system shall be evaluated in selecting the staff member to be released without consideration of race or color. A report containing any such proposed dismissals, and the reasons therefor, shall be filed with the Clerk of the Court, serving copies

upon opposing counsel, within five (5) days after such dismissal, demotion, etc., as proposed.

3. *Past Assignments.* The defendants shall take steps to assign and reassign teachers and other professional staff members to eliminate the effects of the dual school system.

C. *School Equalization.*

1. *Inferior Schools.* In schools heretofore maintained for Negro students, the defendants shall take prompt steps necessary to provide physical facilities, equipment, courses of instruction, and instructional materials of quality equal to that provided in schools previously maintained for white students. Conditions of overcrowding, as determined by pupil-teacher ratios and pupil-classroom ratios shall, to the extent feasible, be distributed evenly between schools formerly maintained for Negro students and those formerly maintained for white students. By October of each year, the defendants shall report to the Clerk of the Court pupil-teacher ratios, pupil-classroom ratios, and per-pupil expenditures both as to operating and capital improvement costs, and shall outline the steps to be taken and the time within which they shall accomplish the equalization of such schools.

2. *Remedial Programs.* The defendants shall provide remedial educational programs which permit students attending or who have previously attended segregated schools to overcome past inadequacies in their education.

D. *New Construction.* The defendants, to the extent consistent with the proper operation of the Washington Parish school system as a whole, shall locate any new school and substantially expand any existing schools with the objective of eradicating the vestiges of the dual system.

E. *Harassment of Pupils.* All appropriate measures shall be promptly and firmly taken at all times to discourage, suppress, discipline, and otherwise punish physical abuses, retaliation, harassment, name-calling, and similar treatment of pupils, whether inflicted, or attempted to be inflicted, by any employees of the School Board. Similar action shall be taken with respect to discouraging and disciplining all racially-motivated conflicts among the students themselves, whether initiated by white or Negro students.

F. *Notice.*

1. *Public Notice.* At least thirty (30) days before the opening of the spring term of the 1967–1968 school year, the defendants shall arrange for the conspicuous publication of a notice describing the provisions of the decree entered herein, as well as the plan and the geographic zoned districts ultimately approved by this Court, prior to the opening of the spring term of the 1967–1968 school year in the newspaper most generally circulated in the parish. The text of the notice shall be similar to the text of the explanatory letter sent home to parents as required by sub-part 2 below. Publication as a legal notice will not be sufficient. Copies of this notice must also be given at that time to all radio and television stations serving the parish. Copies of this decree and the aforesaid notice shall be posted in each school in the school system and at the Office of the Superintendent.

2. *Personal Notice.* At least thirty (30) days before the opening of the spring term of the 1967–1968 school year, the defendant School Board shall distribute an explanatory letter and a notice to all students enrolled in the Washington Parish School system. The text of the explanatory letter shall conform as nearly as possible to a sample letter to be drafted at a later date by the Court in supplementation of this order.

IV.

REPORTS TO THE COURT

In addition to the submission of the map and the supplemental plans required by Part II–B of this order, and the reports which may be required under Part III–B–2 and Part III–C–1 of this order,

the School Board is required to make the following reports:

1. *Report After School Opening.* The defendants shall file with the Clerk of the Court fifteen (15) days after the opening of the spring semester of the 1967–1968 school year, and in the fall semester each year thereafter, a report setting forth the following information:

(a) The number of white and Negro pupils enrolled in each school, listed by grade.

(b) The number of faculty vacancies by school that have occurred or been filled by the defendants since the order of this Court, or the latest report submitted pursuant to this subparagraph. This report shall state the race of the teacher employed to fill each such vacancy and indicate whether such teacher is newly employed or was transferred from within the system. The tabulation of the number of transfers within the system should indicate the schools from which, and to which, the transfers were made. The report shall also set forth the number of faculty members of each race assigned to each school for the current year.

2. *Records on Grants or Denials of Transfers.* Whenever, pursuant to the provisions of Paragraph II–C–5, a student has applied for reassignment to a school other than that serving his zone or residence, the School Board shall retain records showing (a) the school and grade applied for; (b) the zone of the student's residence and his grade therein; (c) the race or color of the student; (d) the reason stated for the student's request; (e) the action taken by the School Board on such request; and (f) the reason the request is granted or denied. Whenever the total number of transfers assigned or permitted from any school or school district upon action taken pursuant to requests made under Paragraph II–C–5, exceeds 2% of the student enrollment at that school or district, this fact shall be reported promptly to the Court, and the School Board shall forthwith present to the Court their rec-

ords containing the information required to be kept by this subsection.

## V.

### COURT COSTS

For reasons which appear in the Court's opinion accompanying this order, the costs incurred in this proceeding to date are hereby taxed against the defendants.

#### On Motion for New Trial

This cause came on for hearing on this date on the motion of the defendants for a new trial. The Court denied the motion orally, for reasons which will appear in the transcript of the proceedings; however, for the purpose of further clarifying some of the issues raised by the Court's opinion and order rendered in this case on October 19, 1967, as amended by Minute Entry of October 26, 1967, the Court now notes the following additional considerations.

The defendants, particularly in their supplemental memorandum in connection with their motion, made much of their conclusion that the *Jefferson County* decision, 371 F.2d 836 (5th Cir. 1966), *en banc* opinion, March 29, 1967, not only sanctioned free-choice pupil assignment systems as constitutional, but made them mandatory as the remedy for *de jure* segregation in the South. Nothing could be further from the truth.

In our opinion and order of October 19, we read *Jefferson County's* requirement that the school districts involved in that decision (all of which districts were operating under free-choice plans) conform to the HEW *Guidelines'* required percentage of integration of students, as an attack on the *de jure* segregation prevalent in the South and inherent in the very nature of free-choice systems of pupil assignment. In ordering a geographical zoning system into effect in Washington Parish, we avoided the issue of a requirement of a certain percentage of integration under a free-choice system by simply recognizing the unreasonable nature of free-choice systems on a permanent basis, and refusing to per-

petuate such a system in Washington Parish solely by the force of the Court's own order in this case.

Although we left open the question of whether or not a free-choice system of pupil assignment would be acceptable in Washington Parish if one were in fact proposed by the School Board, rather than imposed by order of this Court, we indicated that we "would question the motives of the School Board in suggesting any plan of pupil assignment other than one based on geographical zones," especially any plan based on the so-called free-choice system.

Our decision, however, was in no way intended to deprive the defendants of their right and duty to propose their own plan of pupil assignment in Washington Parish; they have every right to do so under our present opinion and order, and we have expressly allowed them to file any plan for pupil assignment which they see fit along with the plan ordered to be submitted on November 27, 1967, by previous order of the Court. What we did hold, however, with respect to the possibility of the School Board's adoption of a free-choice pupil assignment system, was that, in view of the unreasonableness and absurdity of such a system in the administration of a school system (an absurdity which the defendants did not attempt to dispute in any way in their briefs and argument on the present motion), the only reasonable inference to be drawn from the adoption of such a system by a school board in the totality of the circumstances surrounding desegregation in the South, is that its adoption is an attempt on the part of such a school board to further de jure segregation. We simply stated that in this situation, there is "some burden placed on a school board which adopts the system to advance some explanation as to why it was adopted and how it accomplishes the basic aims of good school administration."

Our interpretation of the Jefferson County decision is that the Court, while condemning free-choice systems in the South as attempts at perpetuating de jure segregation (inferring that, though not expressly, from the very unreasonableness of the system as well as from its adoption in the circumstances prevailing in the South), recognized that the inference of de jure discrimination inherent in free-choice plans could be overcome only by a showing, for which the burden must lay on the school boards adopting the plan, that in fact substantial integration has been achieved under such systems. The Fifth Circuit did not require as mandatory, free-choice systems in the South; certainly the defendants would not argue that the geographical zoning system adopted by the Orleans Parish School Board is inconsistent with the Jefferson County decision. Nor do we think the Fifth Circuit in Jefferson County in any way approved free-choice systems. We reaffirm our interpretation of Jefferson County, not as an approval, but a condemnation of the free-choice system, and the imposition upon the school boards adopting such a system of the burden of showing substantial affirmative integration under the system in order to rebut the presumption of de jure discrimination which must otherwise be drawn.

As we stated at the hearing of this motion and elsewhere, we would not only not preclude the School Board from suggesting a plan of pupil assignment of its own, we would encourage it, and in fact we have demanded it. And we do not now suggest, nor have we ever suggested, that we would refuse the School Board the right to present to this Court its own free-choice system of pupil-assignment. If the latter plan is to be submitted as the Board's system, however, it must be accompanied by proof from the Board that substantial integration has resulted under such a system operating in Washington Parish if the inference of de jure segregation inherent in that system is to be rebutted.