Rachel Lynn BELL, a minor, by Mrs. Odessa K. Bell, her mother, etc., et al., Plaintiffs-Appellants,

v.

SCHOOL CITY OF GARY, INDIANA, et al., Defendants-Appellees.

No. 14152.

United States Court of Appeals Seventh Circuit.

Oct. 31, 1963.

**210**

F. Laurence Anderson, Jr., Gary, Ind., Robert L. Carter, Barbara A. Morris, New York City, Anderson, Hicks & Anderson, Hilbert L. Bradley, Gary, Ind., Richard G. Hatcher, East Chicago, Ind., Charles Wills, Indianapolis, Ind., of counsel, for appellants.

Albert H. Gavit, Gary, Ind., Edmond J. Leeney, Hammond, Ind., Orval Anderson, Gary, Ind., for appellees.

Before DUFFY, SCHNACKENBERG and CASTLE, Circuit Judges.

DUFFY, Circuit Judge.

Approximately one hundred minor school children enrolled in the public schools of Gary, Indiana, brought this action for a declaratory judgment upon their own behalf and also upon behalf of all others similarly situated. The principal relief asked was that defendants be enjoined from operating and providing racially segregated public schools in Gary, Indiana. One of the named defendants is The School City of Gary, Indiana.[1]

Subsequent to the trial below, District Judge Beamer wrote an excellent opinion which was incorporated in his Findings of Fact and Conclusions of Law. The opinion has been printed (D.C., 213 F. Supp. 819). In this opinion on appeal we have approved of, adopted and used a number of the District Court's concise statements of fact.

Gary is a rapidly growing industrial city in northwest Indiana. The District Judge pointed out that "Geographically it is shaped much like the capital letter 'T'. Its north boundary line is the southern shore of Lake Michigan. The stem of the 'T' extends approximately * * * two miles wide. The cross-bar of the 'T' is approximately four miles wide and extends east and west a distance of approximately ten and one-half miles. * * *"

In 1950, the population of Gary was 133,911 which included 39,326 Negroes. In 1960, the population was 178,320 of which 69,340 were Negroes.

The student population in the public schools of Gary for the 1951–1952 school year was 22,770 of which 8,406 or approximately 37% were Negroes. In the 1961–1962 school year there were 43,090 students in the public school system, and 23,055 or approximately 53% were Negroes.

In 1951, the School City of Gary maintained and used twenty school buildings. In 1961, the number of school buildings had increased to forty. Additional schools were in the process of completion at the time of the trial of this case.

In the school year 1961–1962, 16,242 students attended twelve schools which were populated from 99 to 100% by Negroes; 6,981 students attended five schools which were 77 to 95% Negroes;

1. By the terms of § 28–1902, Burns Indiana Statutes, the City of Gary is declared to be a school corporation for school purposes, " * * * and shall be known and designated as 'School City of [Gary] Indiana.'" Where the term "defendant" is used in this opinion, reference is to School City of Gary, Indiana.

4,066 attended four schools which had a range from 13 to 37% Negroes; 5,465 attended five schools which had a Negro population of from one to five percent.

The Negro population in Gary is concentrated in the "Central District" which occupies roughly the south half of the cross-bar of the "T" from east to west and is bounded on the north by the Wabash Railroad and on the south by the city limits and the Little Calumet River. Approximately 70,000 Negroes including 23,000 Negro school children live in this District which comprises about one third of the area of the city.

The City of Gary was organized in 1906. Originally, eight school districts were laid out, and as the school population required, one large school was built in each of the eight districts. As the school population expanded, elementary schools were built. At the same time, attendance zones were drawn for such elementary schools and as the students completed the course in the elementary school to which they were assigned, they then went to the high school in the district in which they resided for the completion of their public school education.

The Board of School Trustees is a bipartisan Board of five members appointed by the Mayor. The Board elects its own officers. Dr. LeRoy Bingham, a Negro, was the President of the Board when this suit was commenced. At the trial, he testified there was no policy of segregation of races in the Gary School system. He also testified the Board adopted a policy of transferring students from several congested areas to less congested areas in order to try to balance the loads in the various buildings; that it was the policy of the Board to make complete use of the facilities available for the benefit of all the children in the school system without regard to race.

The School staff has been integrated. A Negro occupies the position of Assistant Superintendent of Schools. He is one of three Assistant Superintendents, all of whom have equal rank. The Co-ordinator of Secondary Education is a Negro as is the Supervisor of Special Education, the Mathematics Consultant, a coordinator in the Food Services Department and a member of the Special Services Department who devotes a large part of his time to the problem of proper boundary lines for attendance areas. There are eighteen Negro principals and thirty-eight white principals.[2] On the teaching staff, there are 798 Negro teachers, 833 white teachers and 3 orientals. All schools with the exception of one small elementary school have at least one Negro teacher on the staff. All but five of the forty-two schools have at least one white teacher.

Those in charge of the administration of the Gary schools have had a difficult problem for more than a decade in maintaining facilities for the rapidly expanding school population. Twenty-two new schools or additions have been built in the last ten years and class rooms have been more than doubled. A school corporation in Indiana is limited in its bonding power to two per cent of the assessed valuation of the property in the District. The Gary School City has been bonded to its limits for the past several years.

For the year 1962, payable in 1963, the property tax rate for the school district of Gary is $5.85 per $100 of assessed valuation. The District Judge noted that this was either the highest or one of the highest rates in the entire state of Indiana.

In addition to building new school buildings, the Board of Trustees and the School Administration have rented churches, storerooms, and utilized such buildings as armories and park buildings for the purpose of providing class rooms for children. Some schools have been operated on a two-shift basis. Roosevelt is predominantly a Negro school. It operates as a senior high school in the morning and as a junior high school in the afternoon. It should be noted that Wallace, an all white school, is operated in precisely the same manner.

2. Assistant principals are included in these figures.

Pursuant to the policy of transferring students from overcrowded schools, 123 students, 92 of whom are Negroes, were transferred from Tolleston, a predominantly Negro school to Mann, a predominantly white school. Eighty-seven Negro students were transferred from Tolleston to Edison, a predominantly white school. One hundred forty students of whom one hundred twenty are Negroes, were transferred from Froebel, a predominantly Negro school to Chase, a predominantly white school.

The transfer of students from one school to another is handled on an individual basis. There is no transfer as a matter of right from one school to the other. However, no racial characteristics are considered in allowing or disallowing a transfer.

The School Board has consistently followed the policy requiring students to attend the school designated to serve the district in which they live regardless of race. This was in accord with the Indiana statute which provides that all students in the public schools are to be admitted " * * * in the public or common school in their districts in which they reside without regard to race, creed or color, class or national origin * * *." § 28–5159 Burns Indiana Statutes.

Plaintiffs' position is grounded on their fundamental theory that their right to be integrated in school is such an over-riding purpose that little, if any, consideration need to be given to the safety of the children, convenience of pupils and their parents, and costs of the operation of the school system. There was testimony that under plaintiffs' plan, at least six thousand pupils would have to be transported on each school day, presumably by bus, and that the cost of operating one bus was $20 per day.

The District Judge pointed out "The safety factors are difficult to solve in this school system. Three U. S. Highways and the Indiana Toll Road traverse Gary from East to West. At least nine railroads cross the city, mostly at grade, as they converge on Chicago from the east or southeast. Some of these railroads have multiple tracks through the city and the streets crossing them are several blocks apart in some areas. The Little Calumet River crosses the city from east to west and is infrequently bridged. These are all safety factors that have to be considered in locating schools and fixing attendance districts."

Let us consider Tolleston School in Gary. In the school year 1951–1952, this school was in a predominantly white neighborhood, only 4.3% of its school-age children were colored. But, in the following ten years, colored people, on their own volition, moved in large numbers into this school district area. There was no change in the school district boundary lines. At the end of this period, the percentage of colored pupils was 76.65%. The plaintiffs claim that the voluntary Negro influx into this area has caused imbalance which defendants have the affirmative duty to change. In effect, plaintiffs say that defendants must somehow transplant from Tolleston enough Negro pupils to reduce their number to 50% of capacity, or some other arbitrary figure, and then, by some means, go out into the forty-two square miles of the City of Gary into the so-called white districts, and bring into the Tolleston School a sufficient number of white students to correct the imbalance.

Plaintiffs are unable to point to any court decision which has laid down the principle which justifies their claim that there is an affirmative duty on the Gary School System to recast or realign school districts or areas for the purpose of mixing or blending Negroes and whites in a particular school.

Plaintiffs argue that Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, proclaims that segregated public education is incompatible with the requirements of the Fourteenth Amendment in a school system maintained pursuant to state law. However, the holding in Brown was that the forced segregation of children in public schools solely on the basis of race, denied the children of the minority group the equal protection

of the laws granted by the Fourteenth Amendment.

■ The situation in Brown is a far cry from the situation existing in Gary, Indiana. The School District boundaries in Gary were determined without any consideration of race or color. We agree with the argument of the defendants stated as "there is no affirmative U. S. Constitutional duty to change innocently arrived at school attendance districts by the mere fact that shifts in population either increase or decrease the percentage of either Negro or white pupils."

After the original opinion in Brown v. Board of Education, supra, the Court set the case for further argument on the question of how its decision should be implemented. Thereafter, a three-judge district court was designated in Kansas to consider the Kansas aspects of the instructions in the Brown case. That Court stated, Brown v. Board of Education, D.C., 139 F.Supp. 468, 470, "Desegregation does not mean that there must be intermingling of the races in all school districts. It means only that they may not be prevented from intermingling or going to school together because of race or color."

In Briggs v. Elliott (EDSC), 132 F. Supp. 776, 777, the Court said: "The Constitution, in other words, does not require integration. It merely forbids discrimination."

We agree with and the record fully sustains the District Court's finding, "An examination of the school boundary lines in the light of the various factors involved such as density of population, distances that the students have to travel and the safety of the children, particularly in the lower grades, indicates that the areas have been reasonably arrived at and that the lines have not been drawn for the purpose of including or excluding children of certain races."

We approve also of the statement in the District Court's opinion, "Nevertheless, I have seen nothing in the many cases dealing with the segregation problem which leads me to believe that the law requires that a school system developed on the neighborhood school plan, honestly and conscientiously constructed with no intention or purpose to segregate the races, must be destroyed or abandoned because the resulting effect is to have a racial imbalance in certain schools where the district is populated almost entirely by Negroes or whites. * * * "

■ We hold that the constitutional rights of the plaintiffs and others similarly situated, were not violated by the manner in which the defendant School District of Gary, Indiana maintained and operated its schools, and that the District Court was correct in dismissing the complaint herein.

Affirmed.