Renee Patrice GILLIAM and Reuben Lemuel Gilliam, Jr., infants, by Reuben L. Gilliam and Joy T. Gilliam, their father and mother and next friends, et al., Appellees,

v.

SCHOOL BOARD OF the CITY OF HOPEWELL, VIRGINIA, and Charles W. Smith, Division Superintendent of Schools of the City of Hopewell, Virginia, and E. J. Oglesby, Alfred L. Wingo and E. T. Justis, constituting the Pupil Placement Board of the Commonwealth of Virginia, Appellants.

No. 9258.

United States Court of Appeals Fourth Circuit.

Argued April 27, 1964.

Decided May 25, 1964.

Frederick T. Gray and A. B. Scott, Richmond, Va. (Robert Y. Button, Atty. Gen., of Virginia, R. D. McIlwaine, III, Asst. Atty. Gen., and Williams, Mullen & Christian, and Peyton, Beverley, Scott & Randolph, Richmond, Va., on brief), for appellants.

Henry L. Marsh, III, Richmond, Va. (S. W. Tucker, Richmond, Va., on the brief), for appellees.

Before SOBELOFF, Chief Judge, and HAYNSWORTH, BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges, sitting en banc.

HAYNSWORTH, Circuit Judge:

The issues tendered by the defendants in this school case have become moot. The appeal will be dismissed for that reason.

As background, reference should first be made to an earlier order from which no appeal was taken.

The Hopewell School Board had been assigning pupils on the basis of geographic zoning, except that members of racial minorities thus assigned to a school were allowed to transfer to some other school in which their race was in the majority. Nine Negro students, in a spurious class action, attacked this method of assignment. In an order dated July 11, 1963, the District Court found that the zone boundaries in some instances had been drawn along racial residential lines, rather than along natural boundaries or the perimeters of compact areas surrounding particular schools. It concluded that denial of admission of the nine pupils to the schools of their choice was discriminatory. A general injunc-

tion was issued. There was a proviso, however, that the School Board might submit a plan for the termination of its discriminatory practices, and, if approved, the general injunction would be suspended and the Board's plan placed in effect.

The School Board accepted this order, and took no appeal from it. Thereafter, it undertook a revision of the school attendance areas, and it eliminated the provision for minority transfers.

Before the Board's revision of its assignment plan was completed, however, and before it was submitted to the Court for approval, it denied fifteen other transfer applications. As to seven, it did so upon the ground that their applications had not been filed by May 31, 1963. As to eight, it did so upon the ground that each of the eight lived close by the school to which he had been assigned and relatively far from the school to which he sought admission.[1] The fifteen filed a motion to intervene in the pending suit and a motion for further relief. By an order dated September 13, 1963, the District Court ordered admission of the fifteen intervening plaintiffs to the schools of their choice.

From this order of September 13, 1963, the School Board and the other defendants have appealed. They contend that seven of the fifteen pupils involved had not applied for transfers prior to May 31, 1963, as required by the rules of Virginia's Pupil Placement Board, one of the appealing defendants, and that the denial of the transfer applications was on non-racial, non-discriminatory grounds. In connection with the latter contention, the School Board says it was not applying its old attendance zones but new ones, revised for the purpose of meriting the approval of the District Court. In any event, it says, the school to which each of the fifteen was assigned by it was so close and conveniently accessible to his residence that under any conceivable geographic assignment system he could not have been as-signed to any other school. It professes its good faith in denial of the fifteen transfer applications, and its effort in good faith to comply with the law is elsewhere evidenced.

The only immediate effect of the order of September 13, 1963, was the admission of the fifteen intervening plaintiffs to the schools of their choice for the academic year 1963–4. They were admitted, as the order required. That academic year approaches its end. Retransfers at this late date are impractical, as the Board concedes. Indeed, a retransfer of those fifteen pupils during this academic year was not an object of this appeal.

When the School Board transferred the fifteen pupils and accepted those transfers as final for the entire academic year 1963–4, it fully complied with the order of September 13, 1963. The order requires nothing else of it. The controversy has thus become moot.

It is apparent that this appeal was perfected by the School Board out of fear of some future order which it envisions as being within the implications of the order of September 13, 1963. It reads the order of September 13, 1963, as implying that it has no control of assignments, because of the injunction order of July 11, 1963, until it shall have obtained approval of a revised assignment plan. It conjures up the spectre of its helplessness if faced with a flood of transfer applications seeking admission to one of its schools for the 1964–5 academic year.

Its alarms are groundless. The order of September 13, 1963, has no such implications.

Until a new assignment plan is approved, the School Board may limit attendance at any particular school in terms of that school's capacity. It may be that, in order to avoid discrimination, it should permit enrollment in a particular school on a first come first served basis, regardless of race, but when that school is filled, the remaining ap-

---

1. This is also true of the seven whose transfer applications were tardy.

plicants may be relegated to a second choice of some school not yet filled.

■ Moreover, the District Court has a wide discretion in authorizing the use of assignment criteria in an interim period during which permanent assignment plans are being formulated and considered. If the School Board feels the need of greater authority than it supposes it has in the interim period, it may apply to the District Court for an interim order accommodating the needs of the Board and the rights of the pupils.

Here, illustratively, the School Board represents to us that it has submitted a revised geographic assignment plan which the District Court has found objectionable only with respect to one boundary. Until the boundary between those two of a number of zones has been acceptably redrawn, it may be that, upon application, the District Court would permit geographic assignments of all pupils living in all of the other zones, while requiring some other assignment method for pupils living in the two unsettled zones. Whether or not it would, and under what circumstances, would be for the District Court to determine in an exercise of an enlightened discretion with full knowledge of the relevant facts. It is mentioned here only as illustrative of the possibilities of relief for a School Board, endeavoring to bring itself into compliance with the requirements of the law, when it stands in real need of interim authority beyond that it clearly possesses.

Of course, the most effective means by which the School Board may avoid anticipated difficulty in handling assignments for 1964-5 is to produce and submit an approvable plan in time to have it become operable when those assignments are to be made.

■ Since there has been full compliance with the order of September 13, 1963, and since we cannot now review some order which may be entered in the future affecting assignments for the school year 1964-5, the appeal is moot.

Appeal dismissed.

ALBERT V. BRYAN, Circuit Judge (dissenting):

I think the appellant School Board still has a lively and substantial concern: what control does it retain over the schools while the new plan is in the making? Further, I do not think the order disapproving the original school zoning, and granting a general injunction against racial discrimination, should meanwhile oust the Board of the power—indeed the responsibility—to exercise reasonable supervision over the schools.

The regulation instantly undertaken by the Board—and voided by the Court—was the rejection of 15 applications for transfer because the schools requested therein were located far from the residences of these pupils. The Board had assigned them to schools nearby their homes, that is to their neighborhood schools, an entirely lawful basis of selection. Bell v. School City of Gary, Indiana, 324 F.2d 209 (7 Cir. Oct. 31, 1963), cert. denied, 84 S.Ct. 1223 (May 4, 1964). Furthermore, 7 of the applications had not been timely filed. That this assignment is sensible and this requirement is needed is undenied and undeniable, but the majority now holds they cannot be effectuated, during the pendency of the over-all plan, except by previously and specially obtained permission of the Court. The reverse, I think, should be the rule: regulation by the School Board continues until the Court deems it misdirected, for the bona fides of the Board is unquestioned.

These are current and pressing problems. Delineation of the remaining province of the Board should now be declared, at least to the lifting of the present circumscription.