345 F.2d 325
 Renee Patrice GILLIAM and Reuben Lemuel Gilliam, Jr., infants, by Reuben L. Gilliam and Joy T. Gilliam, their father and mother and next friends, and all others of the plaintiffs, Appellants,
v.
SCHOOL BOARD OF the CITY OF HOPEWELL, VIRGINIA, and Charles W. Smith, Division Superintendent of Schools of the City of Hopewell, Virginia, Appellees (two cases).
 No. 9625.
 No. 9626.
 United States Court of Appeals Fourth Circuit.
 Argued November 5, 1964.
 Decided April 7, 1965.
 
 Henry L. Marsh III, and S. W. Tucker, Richmond, Va., for appellants in No. 9625 and appellees in No. 9626.
 Frederick T. Gray, Richmond, Va. (Williams, Mullen & Christian, Richmond, Va., on brief), for appellees in No. 9625 and appellants in No. 9626.
 Before SOBELOFF, Chief Judge, and HAYNSWORTH, BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges, sitting en banc.
 HAYNSWORTH, Circuit Judge.
 
 
 1
 These are cross appeals from an order of the District Court approving Hopewell's geographic plan for the assignment of pupils to its schools and refusing to require the retransfer of certain Negro pupils attending schools outside of their geographic zones under a previous order of the Court. Finding no error on either appeal, we affirm.
 
 
 2
 Hopewell, Virginia, is an industrial city located at the confluence of the James and Appomattox Rivers. It is roughly bisected by the Norfolk and Western Railroad, which runs from Hopewell's southwestern border roughly northeasterly to the James River, while the Seaboard Airline Railroad divides the city in an approximately east-west direction. Except in the southwestern portion of the city, the Norfolk and Western Railroad is bounded on its southeastern side by many factories, and there are long reaches of that railroad which are uncrossed by streets. These railroads, and the industrial sections which bound them, constitute obvious and natural geographic boundaries between residential areas, some of which are made remote from each other by the intervening industrial, nonresidential sections which abut the railroads.
 
 
 3
 The School Board adopted a geographic zoning plan. The zone boundaries were drawn along natural geographic boundaries, particularly the railroads. The schools are centrally located in each zone, except for two zones in areas annexed to the City of Hopewell after those two schools had been constructed.
 
 
 4
 Some Negroes live on the northwestern side of the Norfolk and Western railroad. They are in an elementary school zone in which the majority of the residents are white. Pupils from the elementary school in that zone are fed automatically to a high school in which the majority of the pupils are white.
 
 
 5
 The great majority of the Negro residents of Hopewell live on the southeastern side of the Norfolk and Western Railroad. With an exception to be mentioned presently, the residential areas in which they live are separated from residential areas inhabited principally by white people by the railroad and by industrialized, nonresidential sections. One elementary school is located centrally in the area it serves, as is another combined elementary and high school attended entirely by Negroes. A third elementary school attended solely by Negroes is located at the extended city limits, this being one of the schools which came into the Hopewell City School System by annexation after it had been constructed.
 
 
 6
 When this action was first commenced and before the court approved Hopewell's geographic zoning plan, it ordered the admission of the then infant plaintiffs into the schools of their choice. They were admitted, after which the School Board took an appeal to this Court. We held that the question was moot, since the order required their admission only for the current year and the School Board had fully complied with the order.[1]
 
 
 7
 Thereafter, after some modification of the plan, principally the addition of a provision giving any child who lived nearer to a school outside of the zone in which its residence was located a right to attend that school, the District Court approved the plan. It refused, however, to require, or permit, the involuntary retransfer of the original plaintiffs transferred pursuant to the earlier order of the Court.
 
 
 8
 The plaintiffs concede, in general, that the elementary school zone boundaries were drawn along natural geographic boundaries and barriers. They contend as unreasonable only the boundary between Arlington and Woodlawn School zones. That boundary, however, runs along a main arterial highway, and the plaintiffs can suggest no other boundary between those zones of geographic significance. Use of that boundary incorporates in the Woodlawn zone certain areas which are closer to Arlington School. However, any transfer to Arlington of any readily divisible portion of that part of the Woodlawn School zone lying closer to Arlington School would result in a transfer to Arlington School of far more pupils than it could receive, leaving Woodlawn School greatly under-populated.
 
 
 9
 These are the two schools which Hopewell acquired by annexation of adjacent territory. Neither is centrally located in the zone it serves, but the main highway along which the School Board has drawn the boundary which separates those two zones is patently the most logical and reasonable. Such an artery is a natural boundary to choose in the absence of any other significant geographic feature. The fact that a portion of Woodlawn zone lies closer to Arlington School than Woodlawn School is not a valid objection to the plan when incorporating a portion of that area into the Arlington School zone would leave Arlington overwhelmed with pupils, for which it could not care, and Woodlawn greatly underpopulated. Arlington zone's other boundaries are the limits of the City, the Seaboard Airline Railroad and industrial areas, so that there are no feasible compensating adjustments by which portions of the Arlington zone might be shifted to permit it to include a portion of Woodlawn zone.
 
 
 10
 Under these circumstances, the District Court was abundantly justified in concluding that the zone boundaries were reasonably drawn in accordance with natural geographic features and not on racial lines.
 
 
 11
 Assignments to the high schools are made in accordance with a feeder system. We find nothing objectionable in this when the primary school zoning is on a nonracial basis, for the result is, in effect to create reasonable zones for the high schools. The zones of those primary schools which feed each high school are collectively the zone for the high school. So viewed, the high school zones are as compact and reasonable as the primary school zones which we have considered.
 
 
 12
 The plaintiffs suggested below that the high school zones might have been drawn differently, but their suggestion was impractical because it would have overly crowded one school while underpopulating another. The School Board's lines achieved an even distribution of pupils, and there was an evidentiary basis supporting the District Court's approval of them.
 
 
 13
 Under the plan, the School Board reserved the right to consider transfer applications to a school other than the one serving the zone in which the pupil resides if founded upon some specific reason, but the plan provides that the race of the applicant will not be a factor to be considered in granting or denying such a transfer application. The School Board in this Court insists that the reservation is intended to take care of extraordinary cases such as that of a crippled child whose mother is a teacher in a school other than one in the zone in which they reside. It is not to be used, the Board says, for the purpose of avoiding or increasing the extent of the mixing of the races in the schools which results from the geographic zoning plan. That is the clear purpose and effect of the plan's limitation upon the reservation. The restriction saves the reservation which would otherwise be suspect, for permissive transfers of minorities granted because of their race are unlawful.[2]
 
 
 14
 The plaintiffs object that the result of the geographic zoning is a large measure of de facto segregation. It is true that it is, but this is because of the residential segregation that exists. The Harry E. James School zone, for instance, bounded in part by Hopewell's city limits, is otherwise largely surrounded by railroad classification yards and industrial tracks, with adjacent industrialized areas, which isolate the residential portions of that zone from all other residential areas. De facto segregation could be avoided for those pupils only by transporting them to distant schools.
 
 
 15
 While the Carter Woodson and the Arlington school zones are not so isolated as the Harry E. James school zone, substantially the same thing may be said of them. They are not gerrymandered zones designed to impose a segregated school population, but de facto segregation results from the fact that the surrounding residential areas are inhabited entirely by Negroes.
 
 
 16
 The Constitution does not require the abandonment of neighborhood schools and the transportation of pupils from one area to another solely for the purpose of mixing the races in the schools.[3]
 
 
 17
 The plaintiffs also complain that the District Court did not order a general reassignment of teachers and administrative personnel on a nonracial basis. There has been no inquiry into that matter in the District Court, and the failure of the District Court here to enter an order in accordance with this request of the plaintiffs is affirmed for the reasons stated in Bradley v. School Board of City of Richmond, Virginia, 4 Cir., 345 F.2d 310 (decided today).
 
 
 18
 The School Board's appeal from the Court's refusal to require or permit the involuntary reassignment of the fifteen pupils we also find to be without merit.
 
 
 19
 It is true that in our earlier opinion[4] we held that the original order of the District Court required the admission of these fifteen pupils to the schools of their choice for the then current school year only. That was the school year of 1963-4. Under the geographic zoning plan, which the Court has now approved, those fifteen pupils would be assigned to other schools than those they now attend.
 
 
 20
 A reassignment of those fifteen pupils to the schools they attended prior to 1963-4 may have a substantially adverse effect upon them. The District Court was entitled to give consideration to that fact, though their continued attendance at the schools where they were assigned for 1963-4 is inconsistent with the otherwise uniformity of the geographic attendance plan.
 
 
 21
 In approving a geographic zoning plan, indeed, any other plan for the assignment of pupils, a District Court has a large measure of discretion in imposing such conditions or exceptions as fairness and justice seem to it to require. The question, therefore, is not answered by a finding that the assignment of these pupils is a departure from the geographic zoning plan which we now approve. It is an exception to it, but the exception imposed by the District Court in the interest of fairness to these fifteen individuals was not beyond the range of discretion vested in it.
 
 
 22
 We find no reversible error in the Order of the District Court.
 
 
 23
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Gilliam v. School Board of City of Hopewell, Virginia, 4 Cir., 332 F.2d 460
 
 
 [2]
 Goss v. Board of Education of City of Knoxville, Tennessee, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632; Dillard v. School Board of City of Charlottesville, 4 Cir., 308 F.2d 920
 
 
 [3]
 Bell v. School City of Gary, Indiana, 7 Cir., 324 F.2d 209; see also Bradley v. School Board of City of Richmond, Virginia, 4 Cir., 345 F.2d 310 (decided this day)
 
 
 [4]
 Gilliam v. School Board of City of Hopewell, Virginia, 332 F.2d 460
 
 
 
 24
 SOBELOFF and J. SPENCER BELL, Circuit Judges (concurring separately).
 
 
 25
 The neighborhood school concept is a legitimate one, and insofar as zone boundaries are drawn without racial discrimination along natural geographical lines we agree that they may be accepted as valid. We are conscious, however, that the size and location of a school building may determine the character of the neighborhood it serves. In applying the neighborhood school concept, the School Board, therefore, must keep in mind its paramount duty to afford equal educational opportunity to all children without discrimination; otherwise school building plans may be employed to perpetuate and promote segregation.
 
 
 26
 We also note the reservation contained in the opinion of the court in respect to the possible misuse of the transfer plan, and assume that the District Court will be alert to prevent abuses. With these considerations in mind and subject to the views expressed more fully in our separate opinion in the Richmond case decided this day, we concur in the judgment of the court.
 
 
 27
 ALBERT V. BRYAN, Circuit Judge (dissenting in part).
 
 
 28
 With the plan of desegregation approved, as it is, I can see neither logic nor other ground for not retransferring the fifteen pupils to the school the plan provides for them. The School Board has requested the reassignment. However, the Court finds it would "have a substantially adverse effect" upon the students. It seems to me the school authorities are better versed than are we on that score. Moreover, the assignment initially was understood to be simply provisional. Finally, the Board, as well as the scholars, is entitled to indiscriminate enforcement of a legitimate plan.