Rebecca E. HENRY et al., Appellants,

v.

The CLARKSDALE MUNICIPAL SEPA-RATE SCHOOL DISTRICT et al.,
Appellees.

No. 23255.

United States Court of Appeals
Fifth Circuit.

March 6, 1969.

 

Henry M. Aronson, Jackson, Miss., Derrick A. Bell, Jr., Jack Greenberg, James M. Nabrit III, Melvyn Zarr, New York City, R. Jess Brown, Jackson, Miss., for appellants, Conrad K. Harper, New York City, of counsel.

Semmes Luckett, Clarksdale, Miss., for appellees.

Before WISDOM and THORNBERRY, Circuit Judges, and COX,* District Judge.

WISDOM, Circuit Judge:

As this case demonstrates, a school board's adoption of a geographic zoning system instead of a "freedom of choice" system is not a guarantee of effective desegregation. "Geographic zoning, like any other attendance plan adopted by a school board in this Circuit, is acceptable only if it tends to disestablish rather than reinforce the dual system of segregated schools." United States v. Greenwood Municipal Separate School District, 5 Cir. 1968, 406 F.2d 1086. In Davis v. Board of School Commissioners of Mobile County, 5 Cir. 1968, 393 F.2d 690, we recognized that in many instances geographic zoning offers "administrative improvement and

---

* William Harold Cox, United States District Judge for the Southern District of Mississippi, sitting by designation.

greater desegregation" but required the Board to make a new effort to draw zone lines "on a nonracial basis so that the attendance-area plan will promote desegregation rather than perpetuate segregation".

■ Here the district court found that the school board acted in good faith. But good faith does not excuse a board's non-compliance with its affirmative duty to liquidate the dual system. Good faith is relevant only as a necessary ingredient of an acceptable desegregation plan.

In 1964, under court order, the Clarksdale Municipal Separate School District of Mississippi redrew its attendance zones and adopted the geographic zoning system as the basis for desegregating its schools. In the fall of that year, not a single child in Clarksdale was enrolled in any school with members of the other race. Again, for the spring semester of the 1964–65 year, not a single child was enrolled in a school attended by children of the other race. When this case was tried in April 1965, 2800 Negro pupils attended the five "Negro" schools in Clarksdale and 2100 white children attended white schools along with two Negro girls who had transferred to the white high school to obtain a course, Latin, not available in the Negro high school.

■ In *Jefferson* this Court considered freedom of choice plans in operation in Jackson, Biloxi, and Leake County, Mississippi, and in other parish and county school districts throughout this circuit. United States v. Jefferson County Board of Education, 5 Cir. 1966, 372 F.2d 836, adopted en banc, 380 F.2d 385, cert. denied sub nom. Caddo Parish School Board v. United States, 1967, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103. Much of what we said in our opinion in that case applies to any school desegregation plan. We held that school officials have an "affirmative duty" to reorganize their schools into "an integrated, unitary school system in which there are no Negro schools and no white schools—just schools". 380 F.2d at 389. We recognized that freedom-of-choice plans have "serious shortcomings" and suggested a detailed order to attempt to overcome some of the shortcomings. We pointed out, *"The only school desegregation plan that meets constitutional standards is one that works."* (Original emphasis.) 372 F.2d at 847. Recently, the Supreme Court has underscored a school board's "affirmative duty" today "to come forward with a plan that promises realistically to work, and promises realistically to work *now*". (Original emphasis.) Green v. County School Board of New Kent County, Virginia, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716. In *Green* the Court found that the freedom of choice plan used in New Kent County was ineffective and suggested alternatives, including zoning, that might bring about a "speedier and more effective conversion [of the dual system] to a unitary, nonracial school system".[1]

A geographic system of allocating students to schools is a pragmatic solution that avoids the "haphazard"[2] element in administering a freedom of choice plan based on the individual pupil's considered or perhaps capricious selection of a school to attend. A district court in Louisiana recently observed:

> If this Court must pick a method of assigning students to schools within

---

1. The court carefully stated, "Although the general experience under 'freedom of choice' to date has been such as to indicate its ineffectiveness as a tool of desegregation, there may well be instances in which it can serve as an effective device. Where it offers real promise of aiding a desegregation program to effectuate conversion of a state-imposed dual system to a unitary, nonracial system there might be no objection to allowing such a device to prove itself in operation." Green v. School Board of New Kent County, 391 U.S. at 440, 88 S.Ct. at 1695. In areas where residential segregation is substantial, freedom of choice or free transfer plans may aid desegregation.

2. See Singleton v. Jackson Municipal Separate School District, 5 Cir. 1966, 355 F.2d 865, 871.

a particular school district, barring very unusual circumstances, we could imagine no method more inappropriate, more unreasonable, more needlessly wasteful in every respect, than the so-called "free-choice" system. Moses v. Washington Parish School Board, E.D.La. 1967, 276 F.Supp. 834.

■ Historically, a compulsory attendance zone system almost invariably prevailed in the school districts in this circuit [3]—until *Brown* [4] ordered an end to school segregation. But an attendance zone plan also may fail to work. When a particular plan does not succeed in converting a dual system into a unitary system, the school board must find ways for the plan to succeed.

The plaintiffs contend that the attendance zone plan in Clarksdale extends promises it cannot fulfill. They allege also that the zones were drawn for the purpose and have had the effect of maintaining the racial identity of each formerly white and formerly Negro school.

The plaintiffs raised additional issues in the district court. One concerned the speed of desegregation to take place in Clarksdale. This issue, of course, is settled: The time is *now*. As *Green* puts it, "delays are no longer tolerable * * * [and] a plan that at this late date fails to provide meaningful assurance of prompt and effective disestablishment of a dual system is also intolerable'. 391 U.S. at 438, 88 S.Ct. at 1694. Other issues in the district court involved the qualitative differences between "white" schools and "Negro"

schools.[5] *Jefferson* tried to put an end to such differences by requiring integration "lock, stock, and barrel": faculty and staff (part VIII), services, facilities, extracurricular activities and programs (part V), and school equalization (part VI).[6] Similarly, *Green* requires "dismantling" of the state-imposed dual system "root and branch".

The issue on this appeal centers on the geographic zones established by the school board. The record clearly establishes that all pupils living in each zone are required to attend the school in that zone. As we recognized in *Jefferson*, however, such factors as residential patterns, the mushrooming of private schools, and a minority-to-majority transfer policy may bring about a school attended exclusively or almost exclusively by students of one race, although the zone originally etched out to supply students for that school may have been racially mixed.

Clarksdale is bisected from the northeast to the southwest by a main line of the Illinois Central Railroad. Commercial and Industrial establishments lie adjacent to both the northern and southern side of the railroad tracks, accentuating the division of the residential areas of the town. Elevated tracks on an embankment add to this division.

Clarksdale is also bisected by the Sunflower River running north-south through the city. The southern half of the city is divided by another line of railroad tracks running north-south, which is built on the same grade as

3. See Moses v. Washington Parish School Board, E.D.La.1967, 276 F.Supp. 834. See also Meador, The Constitution and the Assignment of Pupils to Public Schools, 45 Va.L.Rev. 517 (1959).

4. Brown v. Board of Education (Brown I), 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Brown II, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083.

5. The order of the district court corrected a number of deficiencies in the administration of schools by providing for equalization of curricula, teacher-salary scales, teacher-pupil ratios, and of per pupil expenditures for all schools of each

level (elementary, junior high, and high schools). United States v. Bessemer Board of Education, 5 Cir. 1968, 396 F. 2d 44; Moses v. Washington Parish, E.D.La.1967, 276 F.Supp. 834, n. 17; HEW Guidelines § 9. The court found merit in the appellants' complaint that teachers were segregated but held that, because of teacher contracts having been signed for the 1965–66 year, faculty desegregation should be temporarily deferred.

6. See especially United States v. Bessemer Board of Education, 5 Cir. 1968, 396 F.2d 44.

the surrounding lands. There are four underpasses and one grade crossing transversing the embanked railroad tracks. Only one of these underpasses is west of the Sunflower River, and it is next to the river. The central business district is in the northern half of Clarksdale, and east of the Sunflower River. Two bridges span the river in both the northern and southern sections of the community.

Traditionally, most Negro residents in the city have lived south of the Illinois Central tracks, while the great majority of the white residents have lived north of the tracks. Under the school board's proposed attendance-zone plan, no school child will cross those tracks. The result was obvious from the beginning: the zoning could produce only token desegregation.

■ The plaintiffs attempted to prove that the purpose behind the board's drawing of the present zone lines is to perpetuate a dual, segregated school system in Clarksdale.[7] They allege that certain pockets of Negro residences north of the tracks were purposefully removed through deannexation, purchase, or urban renewal by public authorities so that no Negroes would reside in the attendance zones of the northern half of Clarksdale.[8] We agree with the district

7. A zoning ordinance, enacted in July 1964 by the City of Clarksdale, de-annexed the property on East Second Street where the Negroes lived; the City and County purchased and demolished the homes located near the County Jail; and the City purchased and demolished the homes in Tuxedo Park, after annexing adjoining territories containing white residences. The Board denies any knowledge of the City and County action, and city officials maintain that the ordinance was not intended to affect school desegregation.

8. The Higgins High School, containing all the Negro pupils in grades 7–12, is located south of these tracks, while the high schools containing all the white public high school pupils are located north of the tracks. For elementary schools, Oliver, Hall, Washington and Riverton, containing all the Negro elementary pupils, are located south of the Illinois Central's tracks. Three of the four elementary schools serving white pupils are located north of the tracks. The fourth elementary school, Eliza Clark, is located in a white residential section south of the tracks. Based on Board statistics provided in March 1965, 865 Negro high school pupils, all but two of the total eligible to attend high school, live south of the Illinois tracks attend Higgins, and if the Board has its way, will continue at Higgins. The effect of zoning one white and four Negro elementary schools located south of the Illinois Central tracks is that all Negroes will be assigned to schools traditionally serving Negro pupils and the great majority of white pupils will be assigned to the white Eliza Clark School. The three remaining white elementary schools located north of the Illinois Central tracks serve only pupils living north of the tracks. Few if any of these students are Negroes. The Board estimated that in December 1964 only one Negro elementary school child was eligible by reason of residence to attend an elementary school now serving only white pupils. The district court approved the high school zones and the elementary zones located north of the Illinois Central tracks, adding requirements that all school facilities be equalized and that students seeking courses not offered in their assigned schools be given the right to transfer to schools where such courses are offered. The order temporarily approved the school zones located south of the Illinois Central tracks, but required reconsideration of these zones by the board and a resubmission of zones "predicated on efficient utilization of available school facilities on a racially nondiscriminatory basis in accordance with sound education princples". The order further provided that, notwithstanding the elementary subdistricts located north of the Illinois Central tracks had been approved, the Board was free to revise these boundaries if this was necessary to accommodate changes in the elementary attendance zones located south of the Illinois Central tracks. The order awarded costs to appellants and retained jurisdiction of the case for additional orders which might become necessary or appropriate. In October 1965 the Board submitted its revised plan for the elementary attendance zones located south of the Illinois Central tracks. The sole change recommended was that the zone line dividing the white Eliza Clark school from the Negro Myrtle Hall school be eradicated and that, effective in September 1966 all first and

court that evidence on this issue is irrelevant, but not for the reasons supporting the district judge's conclusion. It is irrelevant because the ultimate inquiry is not whether the school board has found some rational basis for its action, but whether the board is fulfilling its duty to take *affirmative* steps, spelled out in *Jefferson* and fortified by *Green,* to find realistic measures that will transform its formerly de jure dual segregated school system into a "unitary, nonracial system of public education".

In Monroe v. Board of Commissioners of the City of Jackson, 1968, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733, a companion case to *Green,* the school board for the city of Jackson, Tennessee, established a plan involving attendance zones drawn according to certain established criteria and containing a free-transfer provision. The schools of Jackson retained their racial identity, with only token integration. The Supreme Court, focusing on the free-transfer aspect of the plan, observed:

> Plainly, the plan does not meet respondent's "affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green v. County School Board, *supra,* 391 U.S. at p. 437–438, 88 S.Ct. at 1694. Only by dismantling the state-imposed dual system can that end be achieved. And manifestly, that end has not been achieved here, nor does the plan approved by the lower courts for the junior high schools promise meaningful progress towards doing so. * * *

That the Board has chosen to adopt a method achieving minimal disruption of the old pattern is evident from its long delay in making any effort whatsoever to desegregate * * *.

The Court concluded that "free transfer", like "freedom of choice", can have no place in a desegregated plan * * "if it cannot be shown that such a plan will further rather than delay conversion to a unitary, nonracial, nondiscriminatory school system * * *."

In Clarksdale only two elementary schools are likely to be attended by children of both races. All other schools will be "white" or "Negro", corresponding to their status before the present plan was adopted. It is evident then that the board here has not fulfilled its duty, spelled out in *Green,* "to come forward with a plan that promises realistically to work, and promises realistically to work *now.*"

The basic criteria the school board used in this case were rational: (1) maximum utilization of school buildings; (2) density of population; (3) proximity of pupils to schools; (4) natural boundaries; and (5) welfare of students. This fifth criterion requires consideration of attractive nuisances and health hazards. The presence of public transportation for school children would be relevant to the weight to be given the proximity criterion. By the same token, natural boundaries, such as the tax districts used in Moses v. Washington Parish, are not to be confused with "historical" boundaries, i. e. those that have historically separated white and Negro residential areas.[9] Finally, safety haz-

---

second grade pupils in the combined zone be assigned to the Eliza Clark school and all pupils in grades three through six be assigned to the Myrtle Hall school. Appellants promptly filed objections to the revised plan, contending that there was no greater justification for retaining the zone lines of the other elementary schools and that, while the eradication of the line between the Myrtle Hall and Eliza Clark zones appeared to have advantages from an educational and desegregational standpoint, the practical effect of assigning the 115

white children from Eliza Clark with the approximate 415 Negro pupils from Myrtle Hall would be that white parents would refuse to send their children to the school and would move their residences to areas north of the Illinois Central tracks where, as the evidence shows, Negroes could not obtain housing.

9. The school board's original plan would have contained an irregularly drawn boundary surrounding the only all-white residential area south of the railroad tracks. This boundary would have zig-

ards may be applicable to students of various ages in differing degrees, and the history of community action vis-a-vis those hazards should be taken into consideration.[10] No one doubts the relevance of such criteria. But a relationship otherwise rational may be insufficient in itself to meet constitutional standards— if its effect is to freeze-in past discrimination. For example, a rational relationship exists between literacy or citizenship tests (fairly administered) and the right to vote. But we enjoin the use of such tests when they freeze into a voters' registration system the effects of past discrimination.

But there is a sixth basic criterion the Board did not use: promotion of desegregation. *Jefferson, Stell, Davis, Braxton, Polk County, Carr, Bessemer, Adams, Graves* and *Greenwood,* and other cases decided by this Court,[11] and now Green v. County School Board of New Kent County, require school authorities to take affirmative action that will tend to eradicate all vestiges of the dual system. For example, given a choice of alternatives, a school board should draw zone lines, locate new schools, consolidate schools, change feeder patterns, and resort to other measures that will reduce the effect of past patterns tending to maintain segregation (or token desegregation). "Where the Board is under compulsion to desegregate the schools (1st Brown case, Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873) we do not think that drawing zone lines in such a manner as to disturb the people as little as possible is a proper factor in rezoning the schools." Northcross v. Board of Education of City of Memphis, 6 Cir. 1964, 333 F.2d 661. In Davis v. Board of School Commissioners of Mobile, Alabama, 5 Cir. 1968, 393 F.2d 690 we considered it our primary concern "to see that attendance zones in the urban areas * * * [are] devised so as to create a unitary racially nondiscriminatory system." We held:

> We therefore accept the board's policy decision in this regard but insist on a survey and new effort to draw zone lines on a nonracial basis *so that the attendance-area plan will promote desegregation rather than perpetuate segregation.* It is intended that attendance areas be designed according to strictly objective criteria with the caveat that *a conscious effort should be made to move boundary lines and change feeder patterns which tend to preserve segregation.* 393 F.2d at 694.

As stated by the U. S. Dept. of Health, Education, and Welfare, in its Policies on Elementary and Secondary School Com-

---

zagged and followed unpaved roads; in sum, it would have cut between the white and neighboring Negro residential areas. The district court disapproved this zone, for obvious reasons.

10. For example, while the use as a boundary of the elevated railroad tracks in Clarksdale would appear reasonable, such appearance must be measured against the past history of school children crossing those tracks to go to a school for their particular race. Having disregarded the tracks as impediments in order to maintain the racial purity of its schools, the school board cannot turn around and consider the tracks impenetrable when doing so will perpetuate that former racial purity. See United States v. State of Louisiana, E.D.La.1963, 225 F.Supp. 353, aff'd 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709; United States v. State of Mississippi, S.D.Miss.1964, 229 F.Supp. 925, rev'd 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717.

11. Board of Public Instruction Duval County, Florida v. Braxton, 5 Cir. 1968, 402 F.2d 900; Stell v. Board of Public Education for the City of Savannah and the County of Chatham, 5 Cir. 1967, 387 F.2d 486; United States v. Board of Public Instruction of Polk County, Fla., 5 Cir. 1968, 395 F.2d 66; Montgomery Board of Education v. Carr, 5 Cir. 1968, 400 F.2d 1; United States v. Bessemer Board of Education, 5 Cir. 1968, 396 F.2d 44; Adams v. Mathews, 5 Cir. 1968, 403 F.2d 181; Graves v. Walton County Board of Education, 5 Cir. 1968, 403 F.2d 184. *Jefferson, Davis* and *Greenwood* are cited in the body of this opinion.

pliance with Title VI of the Civil Rights Act of 1964 (March 1968):

> School systems are responsible for assuring that to the extent it is administratively feasible, the zone boundaries do not perpetuate any vestiges of a dual school structure and that among the various attendance zone arrangements which are possible, it establishes the one which best promotes elimination of its dual school structure.

■■ Bearing in mind the historical background of state-compelled educational segregation, consideration of race may be necessary to provide an adequate remedy that will erase or minimize the effects of the dual school system. "The court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." United States v. State of Louisiana, 1965, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709. A school board's zoning policy may appear to be neutral but in fact tend to retard desegregation because it binds pupils to custom-segregated neighborhoods. In this situation, the board's failure to take corrective action amounts to the State's giving official sanction to continued school segregation, contrary to the mandate of this Court and of the Supreme Court.[12] Black nationalists and white racists notwithstanding, school integration is relevant: It is an educational objective as well as a constitutional imperative.

■ At the time this case was tried Clarksdale still had segregated schools. A long time has elapsed since the trial, partly because this Court delayed rendering its decision in order to obtain further enlightenment from the Supreme Court on the subject of attendance zones plans as against freedom of choice plans. In view of the delay, we believe that the interests of justice require that the case be remanded for a hearing to determine the effectiveness of the Clarksdale plan in today's factual setting and in the light of *Green* and other decisions of the Supreme Court and of this Court. The Board should bear in mind that it bears the burden of proving that its existing plan of desegregation is adequate *now* "to convert [the dual system] to a unitary system in which racial discrimination would be eliminated root and branch". If the plan does not promise "realistically to work now", the Board bears the burden of taking corrective action. An effective plan should produce desegregated faculties, staff, facilities, transportation, and school activites (such as athletics) along with integrated student bodies. If there are still all-Negro schools, or only a small fraction of Negroes enrolled in white schools, or no substantial integration of faculties and school activities then, as a matter of law, the existing plan fails to meet constitutional standards as established in *Green* and its companion cases. The board should consider redrawing its attendance-zone boundaries, incorporating a majority-to-minority transfer provision in its plan,[13] closing all-Negro

---

12. "The impact [of segregation] is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group." Brown I, 347 U.S. at 494, 74 S.Ct. at 691. See Strauder v. State of West Virginia, 1880, 100 U.S. 303, 25 L.Ed. 664. See also United States v. School District 151 of Cook County, Illinois, 7 Cir. 1968, 404 F.2d 1125, in which the Seventh Circuit distinguished Bell v. School City of Gary, 7 Cir. 1963, 324 F.2d 209, followed by Deal v. Cincinnati Board of Education, 6 Cir. 1966, 369 F.2d 55 and Downs v. Board of Education, 10 Cir. 1964, 336 F.2d 988 on the ground that they dealt with "innocently arrived at de facto segregation with 'no intention or purpose' to segregate Negro pupils from White". The dissenting opinion here cites with approval *Bell, Deal* and *Downs*.

13. "If school officials in any district should find that their district still has segregated faculties and schools or only token integration, their affirmative duty to take corrective action requires them to

schools, consolidating and pairing schools, rotating principals, and taking other measures to overcome the defects of the present system. As to its attendance zones,

> zone boundaries or feeder patterns designed or used to perpetuate or promote segregation shall be discontinued, and such zone lines shall be redrawn, wherever feasible, to maximize desegregation or eliminate segregation. No zone boundaries or feeder patterns which maintain what is essentially a segregated school structure shall be used. Braxton v. Board of Public Instruction of Duval County, M.D.Fla. 1967, F.Supp.

Accordingly, we remand this case to the district court for entry of a judgment or further proceedings consistent with this opinion.

### WILLIAM HAROLD COX, District Judge (dissenting).

This school case was argued before and presented to this Court on May 25, 1966, with the other school cases presented to and decided by the Court in what is generally known as the *Jefferson* decision.[1] This case has been voluntarily held through the intervening time by the Court without any effort to dispose of it prior to this time. On August 10, 1965, Honorable Claude F. Clayton, as trial judge,[2] issued an opinion and entered a consequent order for a permanent injunction to end all aspects of segregation of the public schools in Clarksdale, Mississippi. On December 18, 1965, another opinion was issued, and an order was entered for the final approval of school plans for the year 1965–1966. Notice of appeal to this Court was given by the plaintiffs "from this Court's order entered December 14, 1965." The entire record with transcripts and exhibits was designated by appellants, and it is presumed that they complain of and appeal from the opinions and orders previously stated.

The 1965–1966 school year has long since passed, and school laws have been updated and strengthened on several occasions in the interim. The people of Clarksdale have acquiesced in the mandate of the Supreme Court in its *Brown* decision and have displayed a good faith effort in this record to respect and comply with such requirements. The trial judge very carefully and very thoroughly and very skillfully assayed all of the facts and circumstances in this case in such school plan, now four years old, with full knowledge of the law and his judicial obligation in the connection. A completely voluntary advisory opinion by this Court under the circumstances would be and is unwarranted and improper. The trial judge not only knew the law, but knew facts and circumstances and drew inferences which unquestionably support his sound decision and judgment in this case. Clarksdale has a very nearly equal Negro and white population, and also has a very large Chinese population and even a large Indian population in the area. These school zones which were set up in these school plans followed natural barriers such as a railroad on an elevated right-of-way running diagonally (northeast to southwest) through and bisecting the city; another railroad dividing the southern part of the city, and Sunflower River dividing the city on the west. An effort was made by appellants to convince the Court that some of these lines were gerrymandered, but the facts clearly show in this record that city streets were used as dividing lines for the school zones, and that in many cases white

---

try an alternative to a freedom of choice plan, such as a geographic-attendance plan, a combination of the two, the Princeton Plan, or some other acceptable substitute, perhaps aided by an educational park." Jefferson I, 372 F.2d at 895–896.

1. United States v. Jefferson County Board of Education, et al., (5 CA) 372 F.2d 836, 380 F.2d 385, cert. denied 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103.

2. Honorable Claude F. Clayton was inducted on November 24, 1967 to the bench of the United States Court of Appeals for the Fifth Circuit.

people lived on both sides of the street; and that when they found themselves in a particular school zone that the children were obliged to attend schools in that zone regardless of predominance of race. The highly experienced and well informed trial judge carefully examined these plans and approved them for the school year indicated and observed that the plaintiffs had nothing better to offer toward complete eradication of segregation from the attendance center involved.

The opinions and orders of the trial judge were carefully drafted to comply with all of the requirements of Civil Rule 52(a) as to finding of facts and conclusions of law where injunctions are involved. There is not a case cited by counsel, or to be found in the majority opinion of the Court in this case, or that has been found on independent research to support any inference or conclusion to the effect that these school zones, as contained in these school plans, with these perfectly natural boundaries and barriers, should not have been accepted and approved as they were at the time by the Court. The accusations of the plaintiffs that these appellees had anything whatever to do with the acquisition by the county of some dilapidated buildings for use of the land as a public park,[3] and that these appellees had anything whatever to do with the municipality changing its boundary as having any effect upon these plans is completely without merit as the trial judge properly held. There was simply nothing that the trial

judge did in this case which is not abundantly supported as to its propriety by facts and circumstances in this record.[4] It is simply not for this Court to usurp the function of the trial court in making its own findings and conclusions of the facts and circumstances in this case independently of the findings and conclusions of that able trial jurist. It must be remembered that the United States Court of Appeals is a creature of statute, and is vested with only statutory appellate jurisdiction as an appellate court, and not as a court of original jurisdiction as a trial court. 28 U.S.C.A. § 1292.

In an injunction case, a plaintiff is entitled to such relief as may be justly due him at the time of the trial of the case, and not to a declaratory expression by this Court on a gratuitous basis, without regard to the facts and circumstances existing at the particular time, which may or not justify a trial judge as knowledgeable of the law, and certainly more familiar with the facts, to reach an entirely different conclusion. Surely, the *Green* case [5] and the *Monroe* case [6] may be expected to receive careful analysis and intelligent and proper consideration and application by the trial court when called upon to consider and apply its criteria; but there is surely nothing to be found in either of those cases which can be safely said to condemn the plans which were approved in 1965 by the trial court for the 1965–1966 school year in this case. The facts as disclosed in this record simply do not support any such conclusion or inference to the contrary here.[7]

3. This park along both sides of Sunflower River as a recreation project will cost one and one-third million dollars according to recent estimate.

4. Yet Civil Rule 52(a) provides: "Finding of facts shall not be set aside *unless clearly erroneous* and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

5. Green v. County School Board of New Kent County, Virginia, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716.

6. Monroe v. Board of Commissioners of Jackson, Tennessee, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733.

7. The trial court, with all of the facts and circumstances clearly before it, and being impregnable to any criticism under the clearly erroneous rule, found as a fact on a full evidentiary hearing that the plans of this Clarksdale school were proper, and afforded an education to each child at an attendance center as a part of a unitary system completely without regard to race and in compliance with the *Brown* cases. The Court further found that the natural barriers to these school zones constituted the lines of their boundaries; and that such boundaries were not gerrymandered, and that the school authorities had done noth-

There is no evidence in this record that anybody did anything in this school district to effect the vested rights of any colored child or to affect the resulting de facto segregation. Certainly nothing has been done under any law, or by force of any public authority or power to even contribute thereto. This Court is called upon to pass judgment on a plan for these Clarksdale schools now four years old. These plans will require and doubtless receive some necessary updating. The plan in suit surely does not aid or encourage or foster or preserve any aspect of segregation of the races under any sort of compulsion. An honest application of freedom of choice as a sound American principle should certainly satisfy all vested rights of all persons.

Under the *Green* decision, it is surely the non-delegable duty of the school board and nobody else to devise a sound workable school plan in compliance with existing decisional law. No court has yet said that there must be *forced mixing* of the races in any particular ratio *contrary to the expressed wishes of students and parents of both races!* There could not be much, either constitutional or American, in such a judicial fiat. When the Court finds, as the trial court here found, that the board was acting in good faith and that its plan had real prospects for dismantling the state imposed dual system at the earliest practicable date, then the plan would meet all requirements of the last announcement of the Supreme Court on this subject.

The principle of bona fide de facto segregation has been approved in four Circuits and the Supreme Court has never said aught to the contrary. In Bell v. School City of Gary, Indiana, (7CA) 324 F.2d 209, cert. denied 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216, it is said: "Plaintiffs are unable to point to any court decision which has laid down the principle which justifies their claim that there is an affirmative duty on the Gary School System to recast or realign school districts or areas for the purpose of mixing or blending Negroes and whites in a particular school." In Gilliam v. School Board of City of Hopewell, Virginia, (4CA) 345 F.2d 325 the Court held: "The Constitution does not require the abandonment of neighborhood schools and the transportation of pupils from the area to another solely for the purpose of mixing the races in the schools." That principle was followed in Deal v. Cincinnati Board of Education, (6CA) 369 F.2d 55, cert. denied 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114; and in Downs v. Board of Education, (10CA) 336 F.2d 988, cert. denied 380 U.S. 914, 85 S.Ct. 898, 13 L. Ed.2d 800. The same result was reached in Gilliam v. School Board of City of Hopewell, Virginia, supra, where the opinion of the trial court was vacated without opinion on such question in 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187, because of a lack of an evidentiary hearing in the trial court. The case at bar was accorded a full evidentiary hearing by an experienced trial judge far more competent than any member of this panel to weigh and judge the problem from the cold pages of this record.

The principle of freedom of choice was heralded in the *Jefferson* decisions which were companion cases to this case and were argued and presented to this Court at the same time. There is nothing wrong with that principle as a means of uprooting every vestige of state enforced segregation. The trouble with the plan not working in most instances is occa-

---

ing to make these boundaries to these school zones work in any particular way. These school zones were designed and grew gradually through the years by reason of economic destiny of the community with nothing else in view. The trial judge thus approved these zones where disparities in population as to race naturally grew and existed, and were accepted as de facto segregation. The facts and circumstances in the *Green* and *Monroe* decisions do not condemn or even disapprove such conclusion under the facts here. The *Green* and *Monroe* principles may not be distorted to say that a given percent or ratio of children as to race must exist as a mathematical equation under all circumstances to meet the requirements of law.

sioned by an insincere, less than half-hearted, effort on the part of some school authorities to see that such plan really worked. No devious devices should be allowed to be engrafted upon such a plan to keep it from being an honest expression of the free will and choice of the parent and child as to the school to be attended.[8] If these school plans in Clarksdale afforded a child a freedom of choice as to the desired attendance center (as does the *Jefferson* plan), such a plan would seem impervious to any just criticism. It is incumbent upon the board, as experienced school people, to devise a plan which will *"work"* within valid constitutional limits. It should not be necessary for the public to have any school closed, or any new school built just to accommodate a workable plan, but the board should have the power and authority to permit transfers from one zone to another within limits of existing facilities and without discrimination as to race. These observations, in response to suggested changes in the plan contained in the majority opinion, are doubtless vulnerable to the same criticism as being dicta, if not obiter dicta.

The suggestion of the majority that the board consider "incorporating a majority-to-minority transfer provision in its plan" is with deference a distortion of the farthest reaches of *Brown* and is completely untenable as a sound principle of constitutional law.[9] The principles announced in *Green* are: "[That] it is in-

cumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing *state imposed* segregation;" that "where the court finds the board to be acting in good faith and the proposed plan to have real prospects for dismantling the state-imposed dual system 'at the earliest practicable date,' then the plan may be said to provide effective relief." These principles are simply not consonant with the newly devised principles found for the first time in the majority opinion here.

The majority do not reverse or vacate the opinion and order of the trial court, but remand the case to the trial court and in such respects I concur. But insofar as the trial court is directed to enter a judgment consistent with and in conformity to the majority opinion, I very respectfully dissent: First, because the majority opinion in this state of record is mere dicta, if not obiter dicta; second, because the majority opinion assumes that the law requires *forced mixing* in these Clarksdale schools in some undesignated ratio as to race to satisfy present requirements as to desegregation of these schools as a matter of decisional law.

Obviously, the delay of the majority in awaiting an announcement of any such principles from the Supreme Court of the United States to support their majority opinion was not fruitful or rewarding. *Green* said that in 1968 a plan had to

8. Significantly, as a declaration of Congressional policy in "Departments of Labor, and Health, Education and Welfare Appropriations Act, 1969" (P.L. 90–557; 82 Stat. 969; Title IV–General Provisions), it is said: "Sec. 409. No part of the funds contained in this Act may be used to force busing of students, abolishment of any school, or to force any student attending any elementary or secondary school to attend a particular school against the choice of his or her parents or parent in order to overcome racial imbalance. Sec. 410. No part of the funds contained in this Act shall be used to force busing of students, the abolishment of any school or the attendance of students at a particular school in order to

overcome racial imbalance as a condition precedent to obtaining Federal funds otherwise available to any State, school district, or school."

9. An unchanged Fourteenth Amendment to the United States Constitution was not violated said the Chief Justice of the United States speaking for every member of the Court in 1927 where it was complained that the state had a policy based on organic law and statutes which excluded a colored child from attendance at a white school. Gong Lum v. Rice, 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172. In *Brown*, the Court decided the case as one of first impression.

promise meaningful and immediate progress toward disestablishing state imposed segregation. Judge Clayton thought and found as a fact in 1965 that this plan did exactly that to his entire satisfaction and the plaintiffs then had nothing better to offer as he said after hearing all of the testimony and receiving all of the evidence in the case, and such finding may not be arbitrarily and capriciously brushed aside as clearly erroneous when it is so abundantly supported, as it is, by the proof in this record. I would affirm and remand.